JS 44 (Rev 06/17)

# CIVIL COVER SHEET

19  2695

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM)*

## I. (a) PLAINTIFFS
Pentec Health, Inc

**DEFENDANTS**
Shelia Haley and Bond Pharmacy, Inc /d/b/a AIS Healthcare

**(b)** County of Residence of First Listed Plaintiff    Delaware
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Clark
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Richard G  Rosenblatt
Morgan Lewis, 1701 Market Street, Philadelphia, PA 19103
215-963-5511

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

❏ 1  U S Government
     Plaintiff

❏ 3  Federal Question
     *(U.S. Government Not a Party)*

❏ 2  U S Government
     Defendant

☒ 4  Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                        *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ❏ 1 | Incorporated or Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated and Principal Place of Business In Another State | ❏ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for  Nature of Suit Code Descriptions

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane    **PERSONAL INJURY** | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product  ❏ 365 Personal Injury - | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | Liability        Product Liability | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel &  ❏ 367 Health Care/ | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| & Enforcement of Judgment | Slander        Pharmaceutical | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers'  Personal Injury | | ❏ 835 Patent - Abbreviated | ❏ 460 Deportation |
| ❏ 152 Recovery of Defaulted | Liability      Product Liability | | New Drug Application | ❏ 470 Racketeer Influenced and |
| Student Loans | ❏ 340 Marine    ❏ 368 Asbestos Personal | | ❏ 840 Trademark | Corrupt Organizations |
| (Excludes Veterans) | ❏ 345 Marine Product  Injury Product | | | ❏ 480 Consumer Credit |
| ❏ 153 Recovery of Overpayment | Liability        Liability | **LABOR** | **SOCIAL SECURITY** | ❏ 490 Cable/Sat TV |
| of Veteran's Benefits | ❏ 350 Motor Vehicle  **PERSONAL PROPERTY** | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | ❏ 850 Securities/Commodities/ |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle  ❏ 370 Other Fraud | Act | ❏ 862 Black Lung (923) | Exchange |
| ☒ 190 Other Contract | Product Liability  ❏ 371 Truth in Lending | ❏ 720 Labor/Management | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal  ❏ 380 Other Personal | Relations | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| ❏ 196 Franchise | Injury        Property Damage | ❏ 740 Railway Labor Act | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| | ❏ 362 Personal Injury -  ❏ 385 Property Damage | ❏ 751 Family and Medical | | ❏ 895 Freedom of Information |
| | Medical Malpractice  Product Liability | Leave Act | | Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ❏ 896 Arbitration |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | ❏ 791 Employee Retirement | ❏ 870 Taxes (U S Plaintiff | ❏ 899 Administrative Procedure |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | Income Security Act | or Defendant) | Act/Review or Appeal of |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate | | ❏ 871 IRS—Third Party | Agency Decision |
| ❏ 240 Torts to Land | ❏ 443 Housing/ | Sentence | | 26 USC 7609 | ❏ 950 Constitutionality of |
| ❏ 245 Tort Product Liability | Accommodations | ❏ 530 General | | | State Statutes |
| ❏ 290 All Other Real Property | ❏ 445 Amer w/Disabilities - | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 446 Amer w/Disabilities - | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration | | |
| | Other | ❏ 550 Civil Rights | Actions | | |
| | ❏ 448 Education | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
    Proceeding

❏ 2 Removed from
    State Court

❏ 3 Remanded from
    Appellate Court

❏ 4 Reinstated or
    Reopened

❏ 5 Transferred from
    Another District
    *(specify)*

❏ 6 Multidistrict
    Litigation -
    Transfer

❏ 8 Multidistrict
    Litigation -
    Direct File

## VI. CAUSE OF ACTION

Cite the U S  Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*
28 U S C  §1332

Brief description of cause

## VII. REQUESTED IN COMPLAINT:
❏ CHECK IF THIS IS A CLASS ACTION
   UNDER RULE 23, F R Cv P

**DEMAND $**
75,001 00

CHECK YES only if demanded in complaint
**JURY DEMAND:**   ❏ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*

JUDGE _____

DOCKET NUMBER _____

JUN 20 2019

DATE
06/20/2019

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG JUDGE _____

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

19-cv-2695

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 50 Applied Card Way, Ste 102, Glen Mills, PA 19342

Address of Defendant: 8498 Villa Circle, Sellersburg, IN 47172 and 623 Highland Colony Parkway, Ridgeland, MS 39157

Place of Accident, Incident or Transaction: ___

---

**RELATED CASE, IF ANY:**

Case Number: _____   Judge: _____   Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year
   previously terminated action in this court?                                                         Yes ☐   No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit
   pending or within one year previously terminated action in this court?                              Yes ☐   No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier
   numbered case pending or within one year previously terminated action of this court?                Yes ☐   No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights
   case filed by the same individual?                                                                   Yes ☐   No ☐

I certify that, to my knowledge, the within case ☐ is ☒ is not related to any case now pending or within one year previously terminated action in
this court except as noted above.

DATE: 06/20/2019

_____
*Attorney-at-Law / Pro Se Plaintiff*          *Attorney I D # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.   Federal Question Cases:**

☐ 1.   Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2.   FELA
☐ 3.   Jones Act-Personal Injury
☐ 4.   Antitrust
☐ 5.   Patent
☐ 6.   Labor-Management Relations
☐ 7.   Civil Rights
☐ 8.   Habeas Corpus
☐ 9.   Securities Act(s) Cases
☐ 10.  Social Security Review Cases
☐ 11.  All other Federal Question Cases
       *(Please specify)* _____

**B.   Diversity Jurisdiction Cases:**

☒ 1.   Insurance Contract and Other Contracts
☐ 2.   Airplane Personal Injury
☐ 3.   Assault, Defamation
☐ 4.   Marine Personal Injury
☐ 5.   Motor Vehicle Personal Injury
☐ 6.   Other Personal Injury *(Please specify)* _____
☐ 7.   Products Liability
☐ 8.   Products Liability – Asbestos
☐ 9.   All other Diversity Cases
       *(Please specify)* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Richard G. Rosenblatt, counsel of record or pro se plaintiff, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case
  exceed the sum of $150,000.00 exclusive of interest and costs.

☒ Relief other than monetary damages is sought.

DATE: 06/20/2019

JUN 20 2019

_____
*Attorney-at-Law / Pro Se Plaintiff*          *Attorney I D # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F R C P 38

Civ 609 (5/2018)



## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

PENTEC HEALTH INC.                    :          CIVIL ACTION
                                      :
SHELIA HALEY and                      :          **19    2695**
BOND PHARMACY INC.,                   :
d/b/a AIS HEALTHCARE                  :          NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.        (   )

(b) Social Security  – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.              (   )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   (   )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                      (   )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)                                                         ( x )

(f) Standard Management – Cases that do not fall into any one of the other tracks.   (   )


| June 20, 2019 | Richard G. Rosenblatt | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215.963.5511 | 215.963.5000 | richard.rosenblatt@morganlewis.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

JUN 20 2019

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| |
|---|
| PENTEC HEALTH INC. |
| Plaintiff, |
| v. |
| SHELIA HALEY and BOND PHARMACY INC., d/b/a AIS HEALTHCARE |
| Defendants. |

Civil Action No. _____

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

### NATURE OF THE ACTION

Plaintiff Pentec Health, Inc., ("Pentec" or "Plaintiff"), by and through its undersigned counsel, hereby brings the following Complaint against Defendants Shelia Haley ("Haley") and Bond Pharmacy Inc., d/b/a AIS HealthCare ("AIS") (collectively, "Defendants") seeking injunctive relief and damages:

### PRELIMINARY STATEMENT

1.      This is a case about a breach of contract and unfair competition by way of tortious interference with contract. This is not the first attempt by Defendant AIS to steal Pentec's market share by inducing Pentec's current and former highly-skilled nursing staff to breach their non-competition agreements that preclude them from providing intrathecal infusion services for a short duration for a competitor of Pentec.  Indeed, Defendant Shelia Haley has accepted the one type of job about which Pentec is concerned – providing the very type of services she provided for Pentec.  Beyond that, Pentec has no objection to Defendant Haley, a long-time registered nurse, from performing any other skilled nursing services for any entity, even AIS.

2.     AIS's reason for implementing its strategy is simple: AIS is a relatively new entrant into the intrathecal infusion therapy market and its quickest way to success (and to find a buyer for the business) is to hire Pentec trained nurses.  But the law doesn't permit such short-cuts where the staff AIS seeks to hire have accepted covenants that place limits on their ability to provide intrathecal infusion services to a competitor such as AIS for a specified duration. And Pentec's interest in having its staff agree to these limitations is clear: Pentec has made a significant investment in developing a specialized training program that is the only such program accredited by the American Nurses Credentialing Center ("ANCC") and which allows Pentec to build goodwill with its physician customers and patients.

3.     AIS has neither the trained staff nor marketplace goodwill that Pentec has. Indeed, it has very few, if any, specifically trained nurses to provide intrathecal infusion therapies. By hiring Pentec nurses, AIS can ride the coattails of Pentec in order to establish relationships with physician customers who write prescriptions for intrathecal therapies – all without the investment that Pentec has made over many years.

4.     AIS's actions are all the more shocking here because on April 5, 2019, Judge Lisa Allen of the Court of Common Pleas of Hamilton County, Ohio entered an injunction against AIS's employment of another former Pentec nurse (Elise Morgan) to serve the Cincinnati, Ohio territory. Attached hereto as Exhibit A is a copy of Judge Allen's Order. In response, AIS fired Ms. Morgan.  While AIS professed in court that there was nothing special about what a nurse administering intrathecal infusion does and that any trained nurse could do it, AIS did not replace Ms. Morgan with a local Cincinnati nurse.  Rather, it went to the considerable expense and inconvenience of hiring Defendant Shelia Haley, who treated some of the same patients as Morgan in the Cincinnati region, to fly into Cincinnati from Indiana to treat

2

patients of a physician she serviced during her tenure at Pentec.[1] It is this latest hiring that spurred this litigation.

5.      It is no coincidence that AIS has repeatedly targeted former Pentec nurses for hire to service former Pentec physicians and patients. Pentec has a one of kind training program in which it has invested hundreds of thousands of dollars to perfect. This significant investment has resulted in a highly trained nursing group with a reputation for consistent top quality care. Defendant Haley was not only a beneficiary of that program, but served as one of its educators. AIS now seeks to capitalize on Pentec's substantial investment to unfairly compete with Pentec.

6.      The Court should not be misled as to what is AIS's real purpose. On June 12, 2019, when the General Counsel of Pentec, Jeffrey Baker, contacted the General Counsel of AIS, John Finley, to notify AIS of the fact that Defendant Haley had agreed to a non-compete agreement that precluded her until December 31, 2019 from providing intrathecal infusion services on behalf of AIS, Mr. Finley explained AIS's true intentions in no uncertain terms. Specifically, Mr. Finley exclaimed to Mr. Baker: **"We are going to crush your non-compete in court and then go around the country and hire every Pentec nurse."**

7.      Pentec brings this lawsuit to enforce its contractual rights, protect its investment, and to put an end to AIS's predatory and unfair practices intended to short-cut to the gain of market share without having to make the investment that Pentec has made. The Court

---

[1]     It also is likely that AIS may have assumed that if it hired another Pentec nurse from Ohio, it could have been stuck back in front of the same judge in Ohio who already enjoined its tortious business practices.  28 U.S.C. § 1441(b)(2) ("A civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.").

should enjoin Defendant Haley from providing any intrathecal services for AIS until, at the earliest December 31, 2019 or such later date that will allow Pentec the full one-year benefit of the agreement it has with her. In so doing, the Court should send a strong message to AIS that its sharp business practices have no place in a fair marketplace.

## PARTIES

8.      Plaintiff Pentec is a Pennsylvania corporation with a principle place of business in Pennsylvania.

9.      Upon information and belief, Defendant AIS is a Mississippi corporation with a principle place of business in Mississippi.[2]

10.      Defendant Haley is a citizen and resident of Indiana.

## JURISDICTION AND VENUE

11.      The District Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 since the amount in controversy in the present action exceeds the sum or value of seventy five thousand dollars ($75,000.00), exclusive of interests and costs, and there exists complete diversity of citizenship, as Pentec is a citizen of Pennsylvania, AIS is citizen of Mississippi and Haley is a citizen of Indiana.

12.      Venue is proper in the District Court pursuant to 28 U.S.C. §1391(b) and the parties' venue selection clause found in the Agreement (as defined below).

---

[2] AIS has conflicting representations on its website regarding its principle place of business as it lists both Mississippi and Texas. *Compare* http://www.aispaincare.com/privacy-policy.php with http://www.aispaincare.com/contact-ais-healthcare.php. (last viewed 6/15/19). Complete diversity exists regardless of whether the principle place of business is in Mississippi or Texas.

## FACTUAL ALLEGATIONS

**A. AIS Attempts to Steal Market Share in the Market for Providing Treatment to Patients with Intrathecal Pumps by Hiring Restricted Pentec Nurses Without Making the Type of Investment Required of Any Fair Market Competitor.**

13.     Pentec is a leading provider of pain medications that are delivered by surgically implanted, programmable intrathecal pumps, which are in part administered and monitored by nurses in the comfort of patients' preferred environment, such as their home, physician's office or other healthcare facility.

14.     Unlike traditional health agencies, Pentec provides a specialized nursing service to complex patients who suffer from severe pain or spasticity and rely on an implanted drug delivery system as an essential part of their treatment.  These patients have not responded to traditional therapy and therefore require a small, surgically-implanted medical device called an intrathecal pump that delivers highly-concentrated medication through a catheter inserted directly into the intrathecal space surrounding the patient's spinal cord.

15.     As relevant here, Pentec nurses serve only patients with intrathecal pumps. Pentec offers patients services that are performed in their own environment by specially-trained registered nurses who have completed the ANCC accredited training program and are licensed to practice in the states in which their patients are located.

16.     AIS Healthcare previously operated under the trade name of Advanced Infusion Solutions and described itself as a "specialty pharmacy" that compounded medications prescribed by physicians.  Recently, however, AIS purports to have "transformed itself from a specialty pharmacy to an advanced care services organization."  As part of its transformation, AIS rebranded itself as AIS HealthCare.  http://www.aispaincare.com/corporate-overview.php (last viewed 6/15/19).

17.     AIS has begun providing many of the same services as Pentec, including patient-specific intrathecal pump medications for infusion services at the patients' preferred environment, such as their home, physician's office or healthcare facility.

18.     While AIS and Pentec have long competed in the space for the sale of infusion pain medications, that is not what this case is about.  Rather, this case is about AIS's continued unethical efforts to gain ground in the market for providing infusion services to patients who are prescribed infusion medications to be delivered through intrathecal pumps.  AIS is seeking to avoid devoting the level of expense, resources and other start-up costs needed to gain share in a new market, in this case, the patient intrathecal infusion services market.  AIS clearly recognizes that it is a lot cheaper to steal Pentec's business than to actually build its own business and workforce in this market space.

19.     Or, as AIS's own General Counsel proclaimed:  "We are going to crush your non-compete in court and then go around the country and hire every Pentec nurse."

**B. Pentec Has Invested Steeply in Developing the Only Intrathecal Training Program Accredited by the American Nurses Association.**

20.     Like all Pentec nurse new hires, Defendant Ms. Haley was the beneficiary of Pentec's intrathecal infusion training program.

21.     Pentec has the **only ANCC accredited training program in the world for intrathecal pumps**, which has contributed to its success as a market leader and established its brand of reliable and safe treatment.

22.     This accreditation did not happen over night. It required hundreds of hours of work and over $200,000 in investment and has evolved through trial and error for the past decade.

23.     Pentec created its program from scratch because no other program was, or is, in existence that meets ANCC standards.

24.     To meet ANCC's standards, Pentec hired external consultants at a significant cost to ensure that its testing accurately measured an applicant's competency and ensured statistical inter-rater reliability.

25.     It took Pentec close to two years to create a training program worthy of initial accreditation.

26.     Pentec's investment in its training program did not cease upon accreditation. Since 2013, Pentec has continued to evolve the program to meet the changing needs of patients, changes in technology and to meet ANCC accreditation requirements.

27.     Every three years Pentec is required to complete a time-intensive application process with the ANCC to be recertified for another three year period. This renewal process requires dozens, if not hundreds, of hours and the hiring of a consultant to prepare an application containing over 400 pages of materials.

28.     Pentec has also invested in a full-time Director of Education whose responsibility is to implement and evolve Pentec's training program.

29.     Pentec's extensive training program includes a two-week offsite orientation where new hire intrathecal nurses ("New Hires") attend intensive classroom presentations.

30.     The first week of classroom training is presented by a Regional Nurse Manager and includes a general orientation to Pentec, equipment, procedure, and documentation.

31.     The second week of classroom presentation is given by a member of Pentec's Education team, all of whom have completed a preceptor training program focused on adult learning.

32.     During the second week, New Hires are given hands on practice with intrathecal drug delivery programmers and practice with accessing IT pumps as well as practice with the Electronic Medical Record (EMR) system.

33.     New Hires are also introduced to clients serviced by Pentec along with the theory behind administration of intrathecal medications via an implanted pump.

34.     After the completion of classroom training, New Hires return to their home territory to train with a Preceptor, who is an experienced Registered Nurse who completed a Preceptor Workshop. This one on one training includes all aspects of care, including but not limited to new admissions, pump refills, pump adjustments, patient assessments, physician contact and documentation. New Hires are not allowed to provide treatment without the assistance and presence of a Preceptor until they complete the training and pass their final examination.

35.     At the end of each week, a weekly progress report is provided to the Regional Nurse Manager and the Director of Education outlining each New Hire's training progress and the goals for the coming weeks.

36.     After the completion of a new hire's training, which was typically three months at the time of Defendant Haley's hiring but is now one year, new hire nurses take the New Hire Learning Assessment ("NHLA"). The NHLA is a proctored assessment that can only be administered by an Educator, Nurse Manager of Customer Education, Chief Nursing Officer or Registered Nurse Manager.

37.     New Hires are required to obtain a passing grade.  New Hires have two opportunities to obtain a passing grade. If they do not obtain a passing grade on the second attempt, they are terminated. Even if they pass the test, new hires receive remedial training for incorrect answers.

38.     Orientation is not completed until the Preceptor, the Chief Nursing Officer, Director of Education, and the Regional Nurse Manager are in agreement that the New Hire successfully completed all areas of the Initial Competency Tool for Nurses. In furtherance of this assessment, a conference call is held during which an Orientation Progress Final Report is completed. At this time a mentor is assigned to each New Hire to further training.

39.     To put a single nurse through this extensive training program costs Pentec well over $50,000.

40.     Pentec's training program has contributed to its reputation for having dependable high quality care, which has in turn provided Pentec with a competitive advantage in the market for intrathecal services. This competitive advantage has led to Pentec's dramatic growth over the past six years from roughly 300 patients prior to accreditation to over 5,000 patients today.

41.     This extensive training program also contributed to Pentec's recent recognition of being the only intrathecal home health agency to receive the prestigious Pathway to Excellence award. The ANCC Pathway to Excellence Program is the premier designation for healthy work environments and recognizes health care organizations that demonstrate a commitment to establishing the foundation of a healthy workplace for staff.  To receive such an award, a health care organization must meet six standards (previously 12 standards when Pentec received the award) that reflect foundational elements for a positive practice environment.

(https://www.nursingworld.org/organizational-programs/pathway/overview/pathway-program-overview/) (last viewed 6/16/19).

42.     Notably, not a single competitor, including AIS, have made the significant investment necessary to establish an accredited program for the provision of intrathecal infusion therapies.

43.     Instead, it would appear, AIS has resorted to capitalizing on Pentec's significant investment by inducing former Pentec employees to breach their post-employment obligations to Pentec. Or as AIS's General Counsel put it: it planned to "go around the country and hire every Pentec nurse."

**C.  Defendant Haley's Roles at Pentec.**

44.     Defendant Haley was hired by Pentec on July 8, 2013 as a staff nurse within the Nursing-SI department and served Pentec's patients in Ohio, Kentucky and Indiana.

45.     In her role as a staff nurse with Pentec, Defendant Haley was responsible for visiting Pentec patients at their homes and in doctors' offices to administer their pain medication via intrathecal pumps.

46.     As part of her role, Defendant Haley had access to, and utilized, confidential information of Pentec, including records pertaining to Pentec customers and patient lists, details as to the customer treatment, needs, costs, charges, pricing,  and other proprietary and patient information not publicly available.

47.     Defendant Haley subsequently requested, and received, a reassignment to the position of traveler nurse on or about March 1, 2015 and was based out of Florida.

48.     In this role she performed the same duties as a staff nurse but was required to provide care to patients throughout the United States.

49.     Defendant Haley again changed positions to a Nurse Educator on July 31, 2016 where she served as a teacher and Preceptor in Pentec's aforementioned training program.

50.     Defendant Haley worked with the Nurse Manager of Customer Education and Regional Nurse Managers to build a streamlined training process that monitors and minimizes the time to new nurse competency.

51.     Defendant Haley also worked with other Nurse Educators and personnel employed by intrathecal pump manufacturers; studied industry literature and attended educational programing to continually evaluate, update and improve Pentec's training program.

52.     As a Nurse Educator, Defendant Haley had access to confidential Pentec training materials such as the tests, testing criteria and tools to measure competency of nurses. This information was tightly controlled by Pentec's education department and trainees were not allowed access to these materials or even retain their completed tests. This information, if disclosed to, or used on behalf of AIS, would provide AIS an unfair competitive advantage, essentially allowing it to freeload off of Pentec's massive investment in training its skilled nurses.

53.     Notably, Defendant Haley was one of the educator's for Elise Morgan, the former Pentec employee that AIS hired in Cincinnati, Ohio four months ago and subsequently fired following the injunction entered against her for breach of her restrictive covenant.

54.     Defendant Haley was also one of six Pentec employees involved in the ANCC credentialing renewal process in 2016, which gave her access to the inner workings of the program and insight into Pentec's methods for achieving accreditation.

55.     In addition to teaching new hires at the corporate office during the initial two weeks of classroom training, Defendant Haley traveled the United States providing on-site

continuing education to Pentec's nurses and, on an as needed basis, intrathecal services to patients and physicians.

56.   As part of this position, Defendant Haley was required to maintain a nursing license for all states in which Pentec operated, or intended to operate which totaled approximately 38 states.  With the exception of Defendant Haley's home state, Pentec paid for all licenses, including in Ohio where she is now covering the territory that former Pentec nurse Elise Morgan covered before the entry of the injunction against her.

57.   Defendant Haley again changed positions with Pentec on December 17, 2017 to a Registered Nurse. Prior to her reassignment, Pentec combined the staff nurse and traveler nurse roles to create the Registered Nurse position. In that position, Defendant Haley provided intrathecal services to Pentec patients and physicians across the United States.

**D.  Defendant Haley's Non-Compete, Non-Service and Non-Disclosure Agreement.**

58.   Defendant Haley, like other Pentec nurses, agreed to a Non-Competition, Non-Solicitation, Confidentiality and Assignment of Inventions Agreement (the "Agreement") at the commencement of employment. Attached hereto as Exhibit B is a copy of Defendant Haley's Agreement.  The Agreement contains certain non-compete, non-solicit and confidentiality covenants that are intended to protect Pentec's legitimate business interests, including its significant investment in Defendant Haley's training, Pentec's training program, physician and patient goodwill, and to protect against unfair competition and misappropriation of confidential information.

59.   The Agreement prohibits Defendant Haley from disclosing or using Pentec's confidential information for any purpose other than carrying out her duties as a Pentec employee both during and after her employment. Specifically, the Agreement provides that

"[Y]ou shall not disclose any Proprietary Information [as defined in the Agreement] to any person or entity that does not owe a duty of confidentiality to the Company." Exhibit B, Section 1 (a).

60.     The Agreement also includes a one year non-compete and non-solicit agreement. Exhibit B, Section 3 (a). The non-compete prohibits Ms. Haley from competing with Pentec in its Field of Interest, which is defined as:

> (A) the administration of medications, nutrients or other solutions and therapies (including anti-infectives, chemotherapy, pain management, parenteral and enteral nutrition, inotropic therapy, hydration therapy, immunotherapy, blood transfusion, steroid therapy, tocolytic therapy, growth hormones and the like) by a qualified home infusion therapy provider to individuals in their homes, nursing facilities or settings other than hospitals ("Home Infusion"). Home Infusion also includes the provision of professional services (such as nursing services) as well as supplies and equipment needed to administer medications, nutrients or other solutions or therapies to individuals in their homes, nursing facilities or settings other than hospitals; and (B) the operation of a coordinated system of pharmacological care, administration and monitoring for patients with chronic illness and complex medical conditions, which includes dispensing and distributing (via mail order and otherwise) injectable and infusible high cost medicinal preparations and therapies to patients who are undergoing intensive therapies for illnesses that are generally chronic, complex and potentially life threatening. For purposes of this Agreement, a business will be deemed competitive with [Pentec] if it engages in a line of business in the Field of Interest . . . .

Exhibit B, Section 3 (a)(i).

61.     The non-solicit agreement prohibits Defendant Haley from soliciting, for the purposes of competing in the Field of Interest with Pentec, patients, customers, referral sources or patrons of Pentec, or any prospective patients, customers, referral sources or patrons with respect to which Pentec has developed or made a presentation for the use or exploitation of products or processes in the Field of Interest. Exhibit B, Section 3 (a)(ii).

13

62.     As a reminder of her obligations to the company, Pentec had Ms. Haley reaffirm her obligations under the Agreement when she changed roles. Attached here to as Exhibit C is a copy of Defendant Haley's Reaffirmation of the Agreement.

**E. Defendant Haley's Breach of the Agreement and AIS's Inducement of the Same in an Effort to Enter and Unfairly Compete in the Intrathecal Infusion Service Market.**

63.     On December 13, 2018, Defendant Haley resigned from her Pentec position effective December 31, 2018.  She explained that she was doing so because of her need to help care for her mother and fatigue from traveling.

64.     Apparently, however, AIS has lured Defendant Haley back to work. Pentec recently has learned that Defendant Haley now is using her registered nurse licenses on behalf of AIS to fill and manage intrathecal pump care on behalf of patients at least in the Cincinnati area and likely elsewhere.

65.     Upon information and belief, Defendant Haley's position and responsibilities with AIS are similar to, if not the same, as her prior role with Pentec.

66.     AIS was, and is, aware of Ms. Haley's Agreement prior to hiring her.

67.     Upon information and belief, AIS induced Ms. Haley to breach the Agreement for its own pecuniary gain.

68.     As noted above, this is not the first time that AIS has hired a Pentec nurse in violation of her restrictive covenant.  Specifically, four months ago, AIS hired Elise Morgan, then an active Pentec nurse, also in violation of a non-compete agreement, to serve the very same physician, Dr. Akbik, in Cincinnati Ohio, that Defendant Haley is now serving. Defendant Haley, like Morgan, treated Dr. Akbik's patients during her tenure at Pentec.

14

69.     To protect its legitimate business interest, Pentec filed a complaint against Elise Morgan and AIS seeking injunctive relief and damages.

70.     Pentec moved for, and obtained, a temporary restraining order (the "TRO") in the Hamilton County Court of Common Pleas preventing Morgan from violating her agreement and AIS from inducing her to do the same.

71.     After the entry of the TRO, AIS terminated Morgan's employment.

72.     Notably, Dr. Akbik did not displace Pentec with AIS for the provision of intrathecal pump nursing care until such time as AIS had been able to obtain a former Pentec nurse to service his patients. Initially, that was Ms. Morgan. Since Ms. Morgan could not provide services, AIS needed someone else who could meet Dr. Akbik's needs. As such, it does not appear to be a coincidence that AIS – desperate to satisfy its new and influential customer, Dr. Akbik, has, again, hired a Pentec nurse in violation of her restrictive covenant in order to secure the market share that it illegally stole away initially on the back of Ms. Morgan.

73.     Instead of investing in its own workforce or hiring any number of available nurses who are not subject to a non-compete, AIS has again targeted and hired a former Pentec employee to serve a former Pentec physician and Pentec patients.  Given that, undoubtedly, there are other nurses available to service patients receiving AIS infusion services, the question is begged as to why AIS continues to insist on hiring Pentec nurses who are subject to restrictive covenants?  The answer is quite straight-forward: AIS knows that Pentec's nurses are well-trained in providing intrathecal infusion treatment and care, and so do physicians such as Dr. Akbik who prescribe such treatments.

**F.  Pentec Has Notified Defendants of their Wrongful Actions.**

74.     On June 7, 2019, Karen McHenry, Senior Vice President of Nursing Services, called Defendant Haley to confirm whether information that Pentec had heard about her providing intrathecal infusion services on behalf of AIS was true. Defendant Haley answered the call, but stated that she would be calling back.  When Defendant Haley did not call back, Ms. McHenry left a voicemail providing her phone number and requesting a return call. Defendant Haley still did not respond.

75.     On June 14, 2019, Ms. McHenry sent an email, which included a copy of the Agreement, to Defendant Haley requesting a call by June 19, 2019 to discuss job opportunities at Pentec now that she had reentered the workforce. The letter also notified Defendant Haley that her employment with AIS violated her Agreement. On June 15, 2019, Ms. McHenry sent a letter with the same text as the email, along with a copy of the Agreement, to Ms. Haley via FedEx overnight.

76.     Pentec has not received a response to Ms. McHenry's voicemail, email or letter, leaving Pentec with no choice but to commence this action to protect its rights and legitimate business interests.

77.     AIS has wrongly retained former Pentec patients and/or physician customers who desire the quality of care provided by Pentec by hiring former Pentec employees, such as Defendant Haley (and Elise Morgan prior thereto), despite their agreements not to compete for limited time period.

78.     Defendant Haley and AIS have also wrongly capitalized on the investment made by Pentec in Defendant Haley's training and her almost nationwide licensure, all paid for (with the exception of her home state license) by Pentec.

79.     Defendant Haley and AIS also are attempting to capitalize on Pentec's goodwill with physicians and patients to obtain an unfair competitive advantage.

80.     As a result of Defendant Haley's and AIS's actions, Defendants have been able to unfairly compete with Pentec and Pentec's goodwill with physicians and patients and opportunity to obtain and retain business has been wrongly damaged.

81.     Although Pentec cannot calculate the value of the harm caused by Defendants' conduct, it is clearly in excess of $75,000.00 given the investment Pentec made in developing its training program and training Defendant Haley and the continued loss of revenue from and goodwill with physicians and patients.  In addition, Defendant AIS stands to continue to be unjustly enriched by virtue of its unfair competitive efforts in an amount far in excess of $75,000.  Finally, Defendant Haley's agreement requires her to pay for Pentec's attorneys' costs and expenses for having to enforce the agreement. Exhibit B, Section 5 (f).

### FIRST CLAIM FOR RELIEF
### (Breach of Contract)
### (Against Haley)

82.     The foregoing paragraphs are incorporated herein as if set forth in their entirety.

83.     The Agreement is a valid and binding contract between Pentec and Defendant Haley which is supported by adequate consideration.

84.     The restrictions contained in the Agreement against competition, solicitation, and the disclosure and misuse of confidential information are reasonable in time, scope, and territory in light of the protection needed by Pentec.

85.     On information and belief, Defendant Haley breached her contractual obligations to Pentec under the Agreement by:

a.   accepting employment with AIS as a registered nurse performing similar, if not the same, duties as her role with Pentec; and

b.   in other particulars to be adduced through further investigation, discovery, or at trial.

86.   As a direct and proximate result of Defendant Haley's misconduct, Pentec has suffered, and will, suffer irreparable harm, including harm to its goodwill with physicians and patients, ability to obtain and retain business and damages.

87.   Pentec has also incurred incidental and consequential damages that were reasonably within the anticipation of Pentec and Defendant Haley when the Agreement was entered.

88.   Pursuant to Section 5(f) of the Agreement, Pentec is entitled to receive compensation for all costs and expenses resulting from Defendant Haley's breach, including legal fees and expenses.

89.   Pentec is entitled to injunctive relief to prevent Defendant Haley from engaging in further misconduct that has, and will continue to, inflict irreparable harm to its business and to recover damages from Defendant Haley.

## SECOND CLAIM FOR RELIEF
### (Tortious Interference with Contractual Relations)
### (Against AIS)

90.   The foregoing paragraphs are incorporated herein as if set forth in their entirety.

91.   Upon information and belief, when AIS solicited, recruited, hired and/or contracted with Defendant Haley, AIS knew that Defendant Haley would breach her valid Agreement with Pentec.

92.   Even in the unlikely event that AIS did not know Ms. Haley was subject to a non-compete agreement, it was on notice as of June 12, 2019.

93.     AIS maliciously, willfully and intentionally interfered with the Agreement.

94.     AIS induced Ms. Haley to breach the Agreement for its own pecuniary benefit.

95.     AIS's foregoing actions were done without justification and have or will cause Pentec actual pecuniary harm.

96.     As a direct and proximate result of AIS's misconduct, Pentec has suffered, and will suffer, irreparable harm, including harm to its goodwill with physicians and patients and the ability to obtain and retain business.

97.     Pentec is entitled to injunctive relief to prevent AIS from engaging in further misconduct that has, and will continue to, inflict irreparable harm to its business and to recover damages from AIS and punitive damages.

### THIRD CLAIM FOR RELIEF
### (Unfair Competition)
### (Against AIS)

98.     The foregoing paragraphs are incorporated herein as if set forth in their entirety.

99.     Upon information and belief, when AIS solicited, recruited, hired and/or contracted with Defendant Haley, AIS knew that Defendant Haley would breach her valid Agreement with Pentec.

100.    AIS has willfully and intentionally interfered with the Agreement in hopes of capitalizing on Pentec's investment in Defendant Haley's training and leveraging the good will associated with the quality of Pentec's nurses.

19

101.     Defendant Haley, a former Pentec nurse and subject of enforceable non-compete and non-service covenants, has treated former Pentec patients.

102.     But for Defendants' conduct, Pentec would have been able to reacquire business with recently separated patients, reestablish relationships with recently separated physicians and would have secured the business of new physicians and/or patients.

103.     AIS has undertaken the foregoing conduct to avoid the types of investment that a business starting up a new service or in a new territory otherwise would have to make. AIS's business tactics are competitively unfair and unethical.

104.     Defendants' foregoing actions were done without justification and have or will cause Pentec actual pecuniary harm.

105.     Defendants' foregoing actions were done with malice and the knowledge that they were unfairly competing with Pentec.

106.     As a direct and proximate result of Defendants' misconduct, Pentec has suffered, and will suffer, irreparable harm, including harm to its goodwill with physicians and patients and its ability to obtain and retain business.

107.     Pentec is entitled to injunctive relief to prevent Defendants from engaging in further misconduct that has inflicted, and will continue to inflict, irreparable harm to its business and to recover damages from Defendants and punitive damages.

## FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment)
### (Against AIS)

108.     The foregoing paragraphs are incorporated herein as if set forth in their entirety.

109.     Upon information and belief, when AIS solicited, recruited, hired and/or contracted with Defendant Haley, AIS knew that Defendant Haley would breach her valid Agreement with Pentec.

110.     AIS has willfully and intentionally interfered with the Agreement in hopes of capitalizing on Pentec's investment in Defendant Haley's training and leveraging the good will associated with the quality of Pentec's nurses.

111.     AIS's hiring of Defendant Haley provides it with the benefit of a fully trained intrathecal nurse and educator and the goodwill that accompanies these credentials.

112.     Defendant Haley  has treated former Pentec patients in her nursing role with AIS.

113.     But for Defendants' conduct, Pentec would have been able to reacquire business with recently separated patients, reestablish relationships with recently separated physicians and would have secured the business of new physicians and/or patients.

114.     AIS has undertaken the foregoing conduct to avoid the types of investment that a business starting up a new service or in a new territory otherwise would have to make.

115.     AIS has been unjustly enrichment by the foregoing actions which were done without justification and have or will cause Pentec actual pecuniary harm.

116.     Defendants' foregoing actions were done with malice and the knowledge that they were unfairly competing with Pentec.

117.     As a direct and proximate result of Defendants' misconduct, Pentec has suffered, and will suffer, irreparable harm, including harm to its goodwill with physicians and patients and its ability to obtain and retain business.

118.    Pentec is entitled to injunctive relief to prevent Defendants from engaging in further misconduct that has inflicted, and will continue to inflict, irreparable harm to its business and to recover damages from Defendants and punitive damages.

**FIFTH CLAIM FOR RELIEF**
**(Injunctive Relief – Rule 65)**
**(Against Haley and AIS)**

119.    The foregoing paragraphs are incorporated herein as if set forth in their entirety.

120.    As set forth above, on information and belief,  Defendant Haley is in breach of the Agreement by virtue of accepting employment with AIS as a registered nurse and by performing similar, if not the same, duties as her role with Pentec; treating former Pentec patients; and in other particulars to be adduced through further investigation, discovery, or at trial.

121.    As a direct and proximate result of Defendant Haley's breach of contract, AIS's inducement of the same, Pentec's business has been damaged.

122.    Because of the nature of Defendants' conduct, there is a strong likelihood that Pentec will succeed on the merits of this case if this case proceeds to trial.

123.    Because of the nature of Defendants' conduct and the substantial similarity between Defendant Haley's current work for AIS and her work at Pentec, Defendants' conduct irreparably harms Plaintiff's business interests in that it creates a substantial likelihood of imminent injury to its goodwill with patients and physicians and to business opportunities with the same.

124.    Immediate injunctive relief is reasonably necessary to protect Pentec's interests during the pendency of this litigation.

125.     Pursuant to Rule 65 is entitled to injunctive relief to prevent Defendant Haley from her continued violation of the Agreement; to stop AIS from inducing Defendant Haley to violate her Agreement; and stop Defendants from unfairly competing with Pentec.

WHEREFORE, Pentec respectfully prays the Court that:

1.     The Court enter a temporary restraining order enjoining

    a.   AIS from employing Defendant Haley in Pentec's Field of Interest (as defined in the Agreement), which, for purposes of this litigation, includes any activities or services related to intrathecal infusion therapies; and

    b.   Defendant Haley from working for AIS, or any other competitor of Pentec, in Pentec's Field of Interest, which, for purposes of this litigation, includes any activities or services related to intrathecal infusion therapies.

2.     After fourteen (14) days, the Court enter a subsequent preliminary injunction enjoining Defendants from operating in violation of the Agreement and unfairly competing with Pentec until such time as this case can be decided on its merits;

3.     The Court finds that Defendant Haley's conduct is in violation of the Agreement and the contractual obligations owed by her to Pentec;

4.     The Court enters a Judgment permanently enjoining Defendant Haley from violating the Agreement for one year from December 31, 2018 plus such additional time during which Defendant Haley was in breach of the Agreement;

5.     The Court enters a Judgment permanently enjoining Defendants' from unfairly competing with Pentec;

6.      Pentec have and recover damages in excess of $75,000.00 from Defendant Haley for her breach of contract, including all of its expenses and legal fees;

7.      Pentec have and recover damages in excess of $75,000.00 and punitive damages from AIS for its tortious interference with the Agreement between Pentec and Defendant Haley;

8.      Pentec have and recover damages in excess of $75,000.00 and punitive damages from AIS for its unfair competition with Pentec.

9.      Pentec have and recover damages in excess of $75,000.00 and punitive damages from AIS for its unjust enrichment to the detriment of Pentec.

10.     Pentec have such other and further relief as the Court shall deem just and proper.


Respectfully submitted,

/s/ _____

Richard G. Rosenblatt
MORGAN, LEWIS & BOCKIUS LLP
richard.rosenblatt@morganlewis.com
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: +1.215.963.5000
Facsimile: +1.215.963.5001

Andrew J. Barber
(*pro hac vice forthcoming*)
andrew.barber@morganlewis.com
One Oxford Centre
Thirty-Second Floor
Pittsburgh, PA  15219-6401
Telephone: +1.412.560.7449
Facsimile: +1.412.560.7001

*ATTORNEYS FOR PLAINTIFF*

## **VERIFICATION**

I, Karen McHenry, Senior Vice President of Nursing at Pentec Health Inc., verify under the penalty of perjury and pursuant to 28 U.S.C. § 1746 that the allegations made in the complaint are true and correct to the best of my knowledge.

Executed on June 20, 2019.

Karen McHenry

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was served this

20th day of June, 2019, via hand delivery upon the following:

Shelia Haley
8498 Villa Circle
Sellersburg, IN 47172
*Defendant*

Bond Pharmacy, Inc., d/b/a AIS Healthcare
c/o National Registered Agents Inc.
645 Lakeland East Drive, Suite 101
Flowood, MS 39232
*Defendant*

/s/ _____
Richard G. Rosenblatt

# Exhibit A

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

| | |
|---|---|
| PENTEC HEALTH INC. ) | Case No. A1901405 |
| Plaintiff, ) | |
| ) | JUDGE LISA C. ALLEN |
| vs. ) | |
| ) | ORDER GRANTING MOTION FOR |
| ELISE MORGAN ) | TEMPORARY RESTRAINING ORDER. |
| ) | |
| and ) | |
| ) | |
| BOND PHARMACY INC., d/b/a AIS ) | |
| HEALTHCARE ) | |
| Defendants. ) | |

Plaintiff Pentec Health, Inc., ("Pentec" or "Plaintiff") has filed a Verified Complaint and

Motion for Temporary Restraining Order and Preliminary Injunction. Proper notice of the

hearing on the motion has been given pursuant to Rule 65(A) of the Rules of Civil Procedure.

This cause came on for hearing on Plaintiff's Motion for Temporary Restraining Order and

Preliminary Injunction. The Court, upon review of the pleadings, evidence and oral argument of

counsel, and fully advised, finds that, as it clearly appears from the specific facts shown therein

that immediate and irreparable injury, loss or damage[4] will result to Plaintiff, Plaintiff's Motion

for Temporary Restraining Order is well taken and grants the same.

**IT IS THEREFORE ORDERED THAT,** pursuant to Rule 65 of the Ohio Rules of

Civil Procedure, Plaintiff's Motion for Temporary Restraining Order shall be, and it is hereby

**GRANTED** as follows:

1.      Morgan from working with AIS, or any other competitor of Pentec, in a role

performing intrathecal infusion therapies pertaining to compounding pain

---

[4] Upon review of the record, the Court concludes that Plaintiff has demonstrated a clear risk to
harm to its patient relationships, customer relationships with physicians, its goodwill with
patients and physicians alike, use of its confidential knowledge of the likes and dislikes of
physicians and patients alike, and the loss of its reputation in the community.

25

management and spasticity prescriptions, refilling intrathecal pumps, preparing and dispensing of renal nutrients and therapies, and such other services or therapies that Pentec provided during the course of Morgan's employment with Pentec;

2.    Morgan from treating and/or soliciting current or former Pentec patients for the same services described in Section 1 above;

3.    AIS from having other Pentec nurses subject to the same or similar restrictions as Morgan from treating and/or soliciting current or former Pentec patients for the same services described in Section 1 above;

4.    Morgan and AIS from tortiously interfering with Pentec's existing and prospective patient relationships; and

5.    AIS from disparaging and/or defaming Pentec's business to Pentec's existing and prospective patients.

This ORDER shall take effect upon Plaintiff's posting of a bond in the amount of $*10,000.00*.    All parties hereby expressly waive the fourteen (14) day requirement as to a preliminary injunction and the hearing on preliminary injunction is scheduled on *TBD* commencing at _____ in front of the Honorable Judge Lisa C. Allen .

**IT IS SO ORDERED.**

ENTERED

APR 05 2019

_____
LISA C. ALLEN, JUDGE

_____
HON. LISA C. ALLEN

26

# Exhibit B

**PENTEC HEALTH, INC.**
**AND AFFILIATED COMPANIES**
**4 Creek Parkway**
**Boothwyn, PA 19061**

**Non-Competition, Non-Solicitation, Confidentiality and Assignment of Inventions Agreement**

This Agreement is made effective as of **July 8**, 2013 by and between **Shelia Haley** ("you" and/or "your") and Pentec Health, Inc., a Delaware corporation (together with its present affiliates, including but not limited to Delaware Valley Home Care, Inc. and Pentech Home Health, Inc., future affiliates, parents and subsidiaries, the "Company"). You hereby agree, in consideration of the Company's agreement to retain you as a **Patient Care Nurse**, provide you a confidential position to be held by you as a key employee of the Company, and the confidential nature and proprietary value of the information which the Company may share with you, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, as follows:

1.      **Confidentiality**.

(a)      <u>Recognition of Company's Rights; Nondisclosure</u>. You recognize that during your affiliation with the Company, the Company will provide you with, and you will have access to, information of substantial value to the Company, which is not old and generally known in the trade, and which gives the Company an advantage over its competitors who do not know or use it, including but not limited to "Proprietary Information" (defined below). You acknowledge that the Company has expended substantial time and money to create, acquire, gather and maintain the confidentiality of its Proprietary Information, and that it would take significant time and money to acquire and duplicate this Information. At all times during your affiliation with the Company and thereafter, you will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information, except as such disclosure, use or publication may be required in connection with your work for the Company, or unless the Company expressly authorizes such in writing. The foregoing notwithstanding, you shall not disclose any Proprietary Information to any person or entity that does not owe a duty of confidentiality to the Company. You will obtain the Company's written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to your work at the Company and/or incorporates any Proprietary Information. You hereby assign to the Company any rights you may have or may acquire in such Proprietary Information and recognize that all Proprietary Information shall be the sole property of the Company and its assigns, and the Company and its assigns shall be the sole owner of all trade secret rights, patent rights, copyrights, mask work rights, and all other rights throughout the world (collectively, "Proprietary Rights") in connection therewith.

(b)      <u>Proprietary Information</u>. The term "Proprietary Information" shall mean any and all confidential and/or proprietary knowledge, data or information of the Company. By way of illustration but not limitation, "Proprietary Information" includes (i) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques (hereinafter collectively referred to as "Inventions"); and (ii) information regarding plans for research, development, new products or services, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers; and (iii) information regarding the skills and compensation of the Company's employees, consultants and/or contractors. The Company's failure to mark any of the Proprietary Information as confidential or proprietary will not affect its status as Proprietary Information.

(c)      "Proprietary Information" does not include information which has ceased to be confidential or proprietary by reason of any of the following: (i) is generally available to the public and

became generally available to the public other than as a result of a disclosure in violation of this Agreement; (ii) became available to you on a non-confidential basis from a third party, *provided* that such third party is not known by you to be bound by a confidentiality agreement with, or other obligation of secrecy to, the Company, or another party or is otherwise prohibited from providing such information to you by a contractual, legal or fiduciary obligation; or (iii) you are required to disclose pursuant to applicable law or regulation (as to which information, you will provide the Company with prior notice of such requirement and, if practicable, an opportunity to obtain an appropriate protective order).

(d)     Third Party Information.  You understand, in addition, that the Company has received and in the future will receive from third parties confidential or proprietary information ("Third Party Information") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes.  During the term of your affiliation with the Company and thereafter, you will hold Third Party Information in the strictest confidence and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for the Company) or use, except in connection with your work for the Company, Third Party Information unless expressly authorized by the Company in writing.

(e)     No Improper Use of Information of Prior Employers and Others.  During your affiliation with the Company, you will not improperly use or disclose any confidential information or trade secrets, if any, of any former employer or any other person to whom you have an obligation of confidentiality, and you will not bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other person to whom you have an obligation of confidentiality unless consented to in writing by that former employer or person.  You will use in the performance of your duties only information which is generally known and used by persons with training and experience comparable to your own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided or developed by the Company.

**2.      Inventions**.

(a)     Assignment.  You hereby assign and agree to assign in the future (when any such Inventions or Proprietary Rights are first reduced to practice or first fixed in a tangible medium, as applicable) to the Company all of your right, title and interest in and to any and all (i) Inventions (and all Proprietary Rights with respect thereto) whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice or learned by you, either alone or jointly with others, during the period of your affiliation with the Company, (ii) Proprietary Information made or conceived or reduced to practice or learned by you, either alone or jointly with others, during the period of your affiliation with the Company, and (iii) any information, data, trade secrets, or other information (however maintained), which you developed, designed, worked on, created, conceived, or learned, either alone or jointly with others, during the period of your affiliation with the Company.  Inventions assigned to the Company, or to a third party as directed by the Company pursuant to this Section 2, are hereinafter referred to as "Company Inventions."

(b)     Obligation to Keep Company Informed.  During the period of your affiliation with the Company and for six (6) months after termination of your affiliation with the Company, you will promptly disclose to the Company fully and in writing and will hold in trust for the sole right and benefit of the Company all Inventions authored, conceived or reduced to practice by you, either alone or jointly with others.  In addition, after termination of your affiliation with the Company, you will promptly disclose to the Company all patent, trademark and copyright applications filed by you or on your behalf within one (1) year after termination of your affiliation with the Company that relate in any way to the business of the Company.

(c)     Maintenance of Records.  You agree to keep and maintain adequate and current written records of all Inventions made by you (solely or jointly with others) during the term of your affiliation with the Company.  The records will be in the form of notes, sketches, drawings, laboratory notebooks, and/or any other format that may be required by the Company.  The records will be available to and remain the sole property of the Company at all times.

(d)     Third Party.  You also agree to assign all of your right, title and interest in and to any particular Company Invention to a third party, as directed by the Company.

(e)     Works for Hire.  You acknowledge that all original works of authorship which are made by you (solely or jointly with others) within the scope of your affiliation with and/or work on behalf of the Company, and which are protectable by copyright are "works made for hire" pursuant to the United States Copyright Act (17 U.S.C., Section 101).

(f)     Licensing and Use of Innovations.  With respect to any Inventions, and work of any similar nature (from any source), whenever created, which you have not prepared or originated in the performance of your work for the Company, but which you provide to the Company or incorporate in any Company product or system, you hereby grant to the Company a royalty-free, fully paid-up, non-exclusive, perpetual and irrevocable license throughout the world to use, modify, create derivative works from, disclose, publish, translate, reproduce, deliver, perform, dispose of, and to authorize others so to do, all such Inventions.  You will not include in any Inventions that you deliver to the Company or use on its behalf, without the prior written approval of the Company, any material which is or will be patented, copyrighted or trademarked by you or others unless you provide the Company with the written permission of the holder of any patent, copyright or trademark owner for the Company to use such material in a manner consistent with then-current Company policy.

(g)     Enforcement of Proprietary Rights.  You will assist the Company in every proper way to obtain, and from time to time enforce, Proprietary Rights relating to Company Inventions in the United States and/or any other applicable country.  To that end you will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Proprietary Rights and the assignment thereof.  In addition, you will execute, verify and deliver assignments of such Proprietary Rights to the Company or its designee.  Your obligation to assist the Company with respect to Proprietary Rights relating to such Company Inventions in any and all countries shall continue beyond the termination of your affiliation with the Company, but the Company shall compensate you at a reasonable rate after the termination of your affiliation with the Company for the time actually spent by you at the Company's request on such assistance.

(h)     In the event the Company is unable for any reason, after reasonable effort, to secure your signature on any document needed in connection with the actions specified in Section 2(g), you hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as your agent and attorney in fact, which appointment is coupled with an interest and made for the benefit of a third party, to act for and on your behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of Section 2(g) with the same legal force and effect as if executed by you.  You hereby waives and quitclaims to the Company any and all claims, of any nature whatsoever, which you now have or may hereafter have for infringement of any Proprietary Rights assigned hereunder to the Company.

(i)     Prior Inventions.  Listed on Exhibit A to this Agreement are any and all Inventions in which you claim or intend to claim any right, title and interest (collectively, "Prior Inventions"), including, without limitation, patent, copyright and trademark interests, which to the best of your

3

knowledge will be or may be delivered to the Company in the course of your affiliation with the Company, or incorporated into any Company product or system. You acknowledge that your obligation to disclose such information is ongoing during the period that you provide services to the Company.

**3.**        **Limitations on Competition and Solicitation.**

(a)        Except as otherwise specifically provided in this Agreement, during the period in which you are employed by or engaged as a consultant by the Company and for a period of one (1) year following the end of your relationship with the Company (i.e., the final day on which you are an employee or consultant to the Company)(the "Term"), irrespective of who ends the relationship or why, you shall not without the prior written consent of the Company:

(i)        In your personal capacity or on behalf of any other, directly or indirectly, either as principal, agent, stockholder, employee, director, consultant, representative or in any other capacity, compete with the Company or own, manage, operate or control, or be concerned, connected or employed by, or otherwise associate in any manner with, engage in or have a financial interest in any business in the Company's Field of Interest within the United States (the "Restricted Territory"). Field of Interest is defined as follows: (A) the administration of medications, nutrients or other solutions and therapies (including anti-infectives, chemotherapy, pain management, parenteral and enteral nutrition, inotropic therapy, hydration therapy, immunotherapy, blood transfusion, steroid therapy, tocolytic therapy, growth hormones and the like) by a qualified home infusion therapy provider to individuals in their homes, nursing facilities or settings other than hospitals ("Home Infusion"). Home Infusion also includes the provision of professional services (such as nursing services) as well as supplies and equipment needed to administer medications, nutrients or other solutions or therapies to individuals in their homes, nursing facilities or settings other than hospitals; and (B) the operation of a coordinated system of pharmacological care, administration and monitoring for patients with chronic illnesses and complex medical conditions, which includes dispensing and distributing (via mail order and otherwise) injectable and infusible high cost medicinal preparations and therapies to patients who are undergoing intensive therapies for illnesses that are generally chronic, complex and potentially life threatening. For purposes of this Agreement, a business will be deemed competitive with the Company if it engages in a line of business in the Field of Interest; provided that nothing contained herein shall preclude you from purchasing or owning stock in any such competitive business if such stock is publicly traded, and provided that your holdings do not exceed one (1.0%) percent of the issued and outstanding capital stock of such business.

(ii)        Either individually or on behalf of or through any third party, directly or indirectly solicit, divert or appropriate or attempt to solicit, divert or appropriate, for the purpose of competing in the Field of Interest with the Company, any joint venture or collaborative research partners, patients, customers, referral sources or patrons of the Company, or any prospective patients, customers, referral sources or patrons with respect to which the Company has developed or made a presentation for the use or exploitation of products or processes in the Field of Interest, located within the Restricted Territory.

(iii)        Either individually or on behalf of or through any third party, directly or indirectly, solicit, entice or persuade or attempt to solicit, entice or persuade any other employees of or consultants to the Company to leave the services of the Company for any reason while any such person is providing services to the Company or within six (6) months after any such person ceases providing services to the Company.

(iv)    Either individually or on behalf of or through any third party, directly or indirectly, interfere, with or attempt to interfere with, the relations between the Company and any vendor or supplier to the Company.

(v) Either individually or on behalf of or through any third party, directly or indirectly engage in any attempt to end or reduce the Company's relationship with any person or entity with which the Company conducts business or make any statement or engage in any conduct that ends or reduces the Company's business relationship with any person or entity with which the Company conducts business.

(b)    You further recognize and acknowledge that (i) the types of employment which are prohibited by this Section 3 are reasonable in relation to the skills which represent your principal salable asset both to the Company and to your other prospective employers, and (ii) the geographical scope of the provisions of this Section 3 is reasonable to you in light of the Company's need to provide and market its services and develop and sell its products in a large geographic area in order to have a sufficient customer base to make the Company's business profitable and in light of the limited restrictions on the type of employment prohibited herein compared to the types of employment for which you are qualified to earn your livelihood.

(c)    If any part of this Section 3 should be determined by a court of competent jurisdiction to be unreasonable in duration, geographic area, or scope, then this section is intended to and shall extend only for such period of time, in such area and with respect to such activity as is determined to be reasonable.

(d)    You will provide a copy of this Agreement to each prospective employer with whom you seek to be hired such that any future employer of yours will be on notice of your obligations under this Agreement.

**4.    No Conflicting Agreements.**   You hereby represent and warrant that you have no commitments or obligations inconsistent with this Agreement.  During the Term, you will not enter into any agreement either written or oral in conflict with this Agreement and will arrange to provide your services under this Agreement in such a manner and at times that your services will not conflict with your responsibilities under any other agreement, arrangement or understanding or pursuant to any employment relationship you have at any time with any third party.  If you are a party to any agreement which may be in conflict with this Agreement, please so indicate by identifying that agreement below your signature at the end of this Agreement and attaching a copy hereto.

**5.    Miscellaneous.**

(a)    This Agreement set forth the entire agreement and understanding between you and the Company.  This Agreement may not be modified or discharged, in whole or part, except by an agreement in writing signed by you and the Company.  The Company may assign its rights and obligations hereunder to any person or entity who succeeds to all or a substantial portion of the business of (i) the Company or its successors, or (ii) that aspect of the Company's business in which you are principally involved.  Notwithstanding the foregoing, this Agreement may not be assigned or otherwise transferred by you without the prior written consent of the Company.

(b)    This Agreement will be binding upon and inure to the benefit of the parties hereto and each party's respective successors, assigns and heirs, as applicable.

(c)    In accordance with and subject to Section 3(c) above, in the event that any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable because it is invalid or in

conflict with any law of any relevant jurisdiction, the validity of the remaining provisions shall not be affected, and the rights and obligations of the parties hereto shall be construed and enforced as if the Agreement did not contain the particular provision(s) held to be unenforceable.

(d)     This Agreement shall be governed by and interpreted in accordance with the laws of the Commonwealth of Pennsylvania, without regard to its provisions as to choice of law. The venue for any dispute arising out of or connected with this Agreement shall lie in the federal courts covering Delaware County, Pennsylvania, or in the Court of Common Pleas of Delaware County, Pennsylvania, in the absence of federal jurisdiction.

(e)     The provisions of this Agreement are necessary for the protection of the business and goodwill of the Company and are considered by the parties to be reasonable for such purpose. You agree that any breach of this Agreement may cause the Company substantial and irreparable harm and, therefore, in the event of any such breach, in addition to other remedies that may be available to the Company, the Company shall have the right to specific performance and other injunctive and equitable relief.

(f)     Should any party breach this Agreement, in addition to all other remedies available at law or in equity, such party shall pay all of any other party's costs and expenses resulting therefrom and/or incurred in enforcing this Agreement, including legal fees and expenses.

(g)     Each party hereto represents and warrants that it or he has the full power and authority to enter into and perform this Agreement, and each party knows of no law, rule, regulations, order, agreement, promise, undertaking or other fact or circumstance which would prevent its or his full execution and performance of this Agreement.

(h)     The parties hereto acknowledge and agree that this Agreement was the result of negotiation and, as such: (i) the rule of construction to the effect that any ambiguities are resolved against the drafting party, and (ii) the terms and provisions of this Agreement, shall be construed fairly as to all parties hereto and not in favor of or against a party, regardless of which party was generally responsible for the preparation of this Agreement.

(i)     Section and other headings contained in this Agreement are for reference purposes only and are in no way intended to define, interpret, describe or otherwise limit the scope, extent or intent of this Agreement or any of its provisions each of which shall be deemed an original, but all of which together shall constitute one and the same document.

(j)     Subject to Section 3, your obligations under this Agreement shall not be affected by any termination or interruption of your employment arrangement with the Company, nor by any change in your relationship with the Company (whether as a result of change of title, position or otherwise).

(k)     This Agreement may be executed in one or more counterparts each of which will be deemed an original, but all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the parties hereto have caused this Non-Competition, Non-Solicitation, Confidentiality and Assignment of Inventions Agreement to be executed under seal as of the date first set forth above.

PENTEC HEALTH, INC.

Shelia Haley

6/4/2013        Date

By: _____  10/ 7/15/13

Joseph Cosgrove        Date
Chairman, President and Chief Executive Officer

7

## EXHIBIT A

TO:            Pentec Health, Inc.

FROM:

SUBJECT:    Previous Inventions

1.      Except as listed in Section 2 below, the following is a complete list of all inventions or improvements relevant to the subject matter of my affiliation with Pentec Health, Inc. (the "Company") that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company:

☐      No inventions or improvements.

☐      See below:

_____

_____

_____

☐      Additional sheets attached.

2.      Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to inventions or improvements generally listed below, the proprietary rights and duty of confidentiality with respect to which I owe to the following party(ies):

| Invention or Improvement | Party(ies) | Relationship |
|---|---|---|
| 1. _____ | _____ | _____ |
| 2. _____ | _____ | _____ |
| 3. _____ | _____ | _____ |

☐      Additional sheets attached.

_Shelia L Haley_ 6/4/13

Shelia Haley                          Date

4374319v.2

# Exhibit C



4 Creek Parkway

Suite A

Boothwyn, PA 19061

Office (610) 494-8700

December 17, 2017

Shelia Haley
8498 Villa Circle
Sellersburg, IN 47172

RE:   Position Change

Dear Shelia,

On behalf of Pentec Health, Inc. (the "Company"), the following letter will detail the terms of your position change from RN Educator to RN, effective December 17, 2017.

The following terms and changes apply to your new position:

* This is a full time, exempt position and your salary will be $83,000.00 per year.

* You will report to Silvia Fajstner, Regional Nurse Manager.

* You may participate in the employee benefits program as it currently exists and/or as you are currently enrolled.

* In addition to Health Benefits, you will continue to be eligible for:

   1. Paid Time off (PTO): PTO combines all vacation, sick, and personal time into one bank. PTO applies when an employee plans time off or when an employee is unable to report to work. Your PTO accrual will remain at 5.85 hours per pay period. For all hours not worked, a PTO request must be completed online and approved by your Supervisor.

   2. Holidays: Pentec provides for seven (7) company paid holidays per year as follows:

   | New Years' Day | Labor Day |
   | Memorial Day | Thanksgiving & Day After |
   | Independence Day | Christmas |

   3. Tuition Reimbursement: For approved courses according to company policy.

You should note that Pentec Health considers the protection of its confidential information, proprietary materials and goodwill to be extremely important. The Non-Disclosure Agreement exists to assure the company and its investors that Pentec Health's valuable intellectual property and goodwill are protected.

Nothing in this Agreement shall be construed as giving Employee the right to be retained in the employ of the Company, and Employee specifically acknowledges that he/she is employed at will and that either Employee or the Company can terminate the employment relationship with or without cause at any time for any lawful reason.

The Non-Disclosure Agreement that you signed on July 8, 2013 will remain in effect in this new role.

If you have any questions pertaining to this change in your employment status with Pentec Health, please do not hesitate to contact a member of the Human Resources team or your supervisor.

We look forward to the contributions you will continue to make to the growth of our company.

Sincerely,

Charlie Wilson
Sr. Vice President Human Resources

Silvia Faraher
Regional Nurse Manager                          01/10/2018

Accepted by: _Shelia Haley_          1-7-2018
                  Shelia Haley                    Date

CC: Human Resources File