**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

--------------------------------------------------------------- x

PENTEC HEALTH INC.,

                       Plaintiff,

           -against-

SHELIA HALEY and BOND PHARMACY INC.,
d/b/a AIS HEALTHCARE,

                  Defendants.

--------------------------------------------------------------- x

: Case No. 2:19-CV-02695-NIQA

**ANSWER, AFFIRMATIVE DEFENSES**
**AND COUNTERCLAIMS**

**JURY TRIAL DEMANDED**

Shelia Haley ("Haley") and Bond Pharmacy Inc. d/b/a AIS Healthcare ("AIS") (together, "Defendants"), by and through their undersigned attorneys Sheppard, Mullin, Richter & Hampton, LLP, hereby answer the Complaint filed June 20, 2019 (the "Complaint") by Plaintiff Pentec Health Inc. ("Pentec") as follows:

**PRELIMINARY STATEMENT**

1.      Defendants deny each and every allegation set forth in Paragraph 1 of the Complaint, except deny knowledge or information sufficient to form a belief as to the truth of final sentence of Paragraph 1.

2.      Defendants deny each and every allegation set forth in Paragraph 2 of the Complaint.

3.      Defendants deny each and every allegation set forth in Paragraph 3 of the Complaint.

4.      Defendants deny each and every allegation set forth in Paragraph 4 of the Complaint, except AIS admits that an injunction was entered by the Court of Common Pleas of

Hamilton County, Ohio, and Haley denies knowledge or information sufficient to form a belief as to the truth of Pentec's allegations regarding its litigation against AIS with respect to Elise Morgan.[1]

5.      Defendants deny each and every allegation set forth in Paragraph 5 of the Complaint, except AIS denies knowledge or information sufficient to form a belief as to the truth of Pentec's allegations regarding its training program.

6.      AIS denies each and every allegation set forth in Paragraph 6 of the Complaint, except admits that Jeffrey Baker contacted Jonathan Finley on or about June 12, 2019 to engage in settlement discussions.  Haley denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 6 of the Complaint.

7.      Defendants deny each and every allegation set forth in Paragraph 7 of the Complaint.

## PARTIES

8.      Defendants admit the allegations set forth in Paragraph 8 of the Complaint.

9.      Defendants admit the allegations set forth in Paragraph 9 of the Complaint.[2]

10.     Defendants admit the allegations set forth in Paragraph 10 of the Complaint.

## JURISDICTION AND VENUE

11.     Paragraph 11 of the Complaint sets forth a legal conclusion as to which no response is required.

12.     Paragraph 12 of the Complaint sets forth a legal conclusion as to which no response

---

[1]      AIS denies each and every allegation set forth in Footnote 1 of the Complaint.  Haley denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Footnote 1 of the Complaint.

[2]      AIS denies each and every allegations set forth in Footnote 2 of the Complaint, and Haley denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Footnote 2 of the Complaint, except Defendants aver that the statement "[c]omplete diversity exists regardless of whether the principle [sic] place of business is in Mississippi or Texas" sets forth a legal conclusion as to which no response is required.

is required.

## **FACTUAL ALLEGATIONS**

13.     Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 13 of the Complaint, except admit that Pentec is a provider of pain medications that are delivered through intrathecal pumps.

14.     Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 14 of the Complaint.

15.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 15 of the Complaint.

16.     AIS admits the allegations in Paragraph 16 of the Complaint and avers that it is a leading provider of advanced sterile, patient-specific intrathecal pump medications and in-home intravenous infusion.  Haley denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 16 of the Complaint.

17.     AIS denies each and every allegation set forth in Paragraph 17 of the Complaint, Haley denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 17 of the Complaint, except Defendants admit that AIS provides patient-specific intrathecal pump medications for infusion services at patients' preferred environment, such as a home, office or healthcare facility.

18.     Defendants deny each and every allegation set forth in Paragraph 18 of the Complaint.

19.     AIS denies each and every allegation set forth in Paragraph 19 of the Complaint. Haley denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 19 of the Complaint.

20.     Defendants deny each and every allegation set forth in Paragraph 20 of the Complaint, except Haley admits that she received training concerning matters already known to her about intrathecal care based upon her 15 years of experience prior to working with Pentec and received training concerning Pentec administrative procedures, such as the proper completion of paperwork.

21.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 21 of the Complaint.

22.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 22 of the Complaint, but aver that publicly available information suggests that Pentec devoted just two years to this endeavor.

23.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 23 of the Complaint.

24.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 24 of the Complaint.

25.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 25 of the Complaint.

26.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 26 of the Complaint.

27.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 27 of the Complaint.

28.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 28 of the Complaint.

29.     Haley denies each and every allegation set forth in Paragraph 29 of the Complaint.

AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 29 of the Complaint.

30.    Haley admits the allegations set forth in Paragraph 30 of the Complaint, but avers that she did not require any training concerning intrathecal care or learn any information that she had not previously known concerning intrathecal care by virtue of her prior 15 years of experience providing intrathecal care.  AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 30 of the Complaint.

31.    Haley admits the allegations set forth in Paragraph 31 of the Complaint, but avers that she did not require any training concerning intrathecal care or learn any information that she had not previously known concerning intrathecal care by virtue of her prior 15 years of experience providing intrathecal care.  AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 31 of the Complaint.

32.    Haley admits the allegations set forth in Paragraph 32 of the Complaint, but avers that she did not require any training concerning intrathecal care or learn any information that she had not previously known concerning intrathecal care by virtue of her prior 15 years of experience providing intrathecal care.  AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 32 of the Complaint.

33.    Haley admits the allegations set forth in Paragraph 33 of the Complaint, but avers that she did not require any training concerning intrathecal care or learn any information that she had not previously known concerning intrathecal care by virtue of her prior 15 years of experience providing intrathecal care.  AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 33 of the Complaint.

34.    Haley admits the allegations set forth in Paragraph 34 of the Complaint, but avers

that she did not require any training concerning intrathecal care or learn any information that she had not previously known concerning intrathecal care by virtue of her prior 15 years of experience providing intrathecal care. AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 34 of the Complaint.

35.     Haley admits the allegations set forth in Paragraph 35 of the Complaint, but avers that she did not require any training concerning intrathecal care or learn any information that she had not previously known concerning intrathecal care by virtue of her prior 15 years of experience providing intrathecal care. AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 35 of the Complaint.

36.     Haley admits the allegations set forth in Paragraph 36 of the Complaint, but avers that she did not require any training concerning intrathecal care or learn any information that she had not previously known concerning intrathecal care by virtue of her prior 15 years of experience providing intrathecal care. AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 36 of the Complaint.

37.     Haley admits the allegations set forth in Paragraph 37 of the Complaint, but avers that she did not require any training concerning intrathecal care or learn any information that she had not previously known concerning intrathecal care by virtue of her prior 15 years of experience providing intrathecal care. AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 37 of the Complaint.

38.     Haley admits the allegations set forth in Paragraph 38 of the Complaint, but avers that she did not require any training concerning intrathecal care or learn any information that she had not previously known concerning intrathecal care by virtue of her prior 15 years of experience providing intrathecal care. AIS denies knowledge or information sufficient to form a belief as to

the truth of the allegations set forth in Paragraph 38 of the Complaint.

39.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 39 of the Complaint.

40.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 40 of the Complaint.

41.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 41 of the Complaint.

42.     Defendants deny the allegations set forth in Paragraph 42 of the Complaint.

43.     Defendants deny the allegations set forth in Paragraph 43 of the Complaint.

44.     Defendants admit the allegations set forth in Paragraph 44 of the Complaint.

45.     Defendants admit the allegations set forth in Paragraph 45 of the Complaint.

46.     Haley denies each and every allegation set forth in Paragraph 46 of the Complaint. AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 46 of the Complaint.

47.     Haley admits the allegations set forth in Paragraph 47 of the Complaint.  AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 47 of the Complaint.

48.     Haley denies each and every allegation set forth in Paragraph 48 of the Complaint, except admits she performed the same duties as a staff nurse.  AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 48 of the Complaint.

49.     Haley admits the allegations set forth in Paragraph 49 of the Complaint.  AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in

Paragraph 49 of the Complaint.

50.     Haley denies each and every allegation set forth in Paragraph 50 of the Complaint, except admits that she participated in the training process based upon the expertise she developed over 15 years prior to becoming employed with Pentec.  AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 50 of the Complaint.

51.     Haley denies each and every allegation set forth in Paragraph 51 of the Complaint, except admits that she received training and independently continued to learn about intrathecal pumps and services.  AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 51 of the Complaint.

52.     Haley denies each and every allegation set forth in Paragraph 52 of the Complaint, except admits that she had access to non-confidential testing materials.  AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 52 of the Complaint.

53.     Defendants deny each and every allegation set forth in Paragraph 53 of the Complaint, except Haley admits that she trained Elise Morgan.

54.     Haley denies each and every allegation set forth in Paragraph 54 of the Complaint. AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 54 of the Complaint.

55.     Haley denies each and every allegation set forth in Paragraph 55 of the Complaint, except admits that she provided intrathecal services to patients and physicians and provide training to nurses based upon her 15 years of experience providing intrathecal care prior to becoming employed at Pentec.  AIS denies knowledge or information sufficient to form a belief as to the

truth of the allegations set forth in Paragraph 55 of the Complaint.

56.     Haley denies each and every allegation set forth in Paragraph 56 of the Complaint, except admits that Pentec financed her nursing license fees in the states where it asked her to operate and in which she did not already have a license.  AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 56 of the Complaint.

57.     Haley denies each and every allegation set forth in Paragraph 57 of the Complaint and avers that she returned to work as a Nurse Traveler and Preceptor and resumed her full-time travel schedule providing intrathecal patient care in 2017.  AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 57 of the Complaint.

58.     Defendants deny each and every allegation set forth in Paragraph 58 of the Complaint, except admit that Haley signed a Non-Competition, Non-Solicitation, Confidentiality and Assignment of Inventions Agreement (the "Non-Compete Agreement") on June 4, 2013.

59.     Defendants deny each and every allegation set forth in Paragraph 59 of the Complaint, except admit that the Non-Compete Agreement contains the quote recited in Paragraph 59 of the Complaint.

60.     Defendants deny each and every allegation set forth in Paragraph 60 of the Complaint, except admit that the Non-Compete Agreement contains the quote recited in Paragraph 60 of the Complaint, and avers that that Plaintiff has failed to provide the entire quote.

61.     Defendants deny each and every allegation set forth in Paragraph 61 of the Complaint.

62.     Haley denies each and every allegation set forth in Paragraph 62 of the Complaint,

except admits that she signed a letter detailing the terms of her position change from RN Educator to RN on January 7, 2018. AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 62 of the Complaint.

63. Defendants admit the allegations set forth in Paragraph 63 of the Complaint.

64. Defendants deny each and every allegation set forth in Paragraph 64, except admit that Haley began work for AIS on or about January 7, 2019.

65. Defendants deny each and every allegation set forth in Paragraph 65 of the Complaint.

66. Defendants deny each and every allegation set forth in Paragraph 66 of the Complaint, except AIS admits that it is currently aware that Haley entered into the Non-Compete Agreement with Pentec.

67. Defendants deny each and every allegation set forth in Paragraph 67 of the Complaint.

68. AIS denies each and every allegation in Paragraph 68 of the Complaint, except admits that it formerly employed Elise Morgan and that she provided intrathecal infusion services to patients of Dr. Humam Akbik during her employment with AIS. Haley denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 68 of the Complaint, except admits that she provided intrathecal infusion services to patients of Dr. Akbik for a very limited period of time during her employment with AIS, but that she had not provided intrathecal infusion services to patients of Dr. Akbik during her employment with Pentec.

69. AIS denies each and every allegation set forth in Paragraph 69 of the Complaint, except admits that Pentec previously filed a complaint against it and Elise Morgan. Haley denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in

Paragraph 69 of the Complaint.

70.    AIS denies each and every allegation set forth in Paragraph 70 of the Complaint, except admits that Pentec obtained a temporary restraining order in the matter captioned *Pentec Health Inc. vs. Elise Morgan and Bond Pharmacy Inc. d/b/a AIS HealthCare*, Case No. A1901405, in the Court of Common Pleas, Hamilton County, Ohio.  Haley denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 70 of the Complaint.

71.    AIS denies each and every allegation set forth in Paragraph 71 of the Complaint. Haley denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 71 of the Complaint.

72.    AIS denies each and every allegation set forth in Paragraph 72 of the Complaint. Haley denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 72 of the Complaint, except avers that she was not hired to provide intrathecal infusion services for AIS.

73.    Defendants deny each and every allegation set forth in Paragraph 73 of the Complaint.

74.    Haley admits the allegations set forth in Paragraph 74 of the Complaint.  AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 74 of the Complaint.

75.    Haley admits the allegations set forth in Paragraph 75 of the Complaint.  AIS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 75 of the Complaint.

76.    Defendants deny knowledge or information sufficient to form a belief as to the truth

of the allegations set forth in Paragraph 76 of the Complaint, except Haley admits that she did not reply to Ms. McHenry.

77.     Defendants deny each and every allegation set forth in Paragraph 77 of the Complaint.

78.     Defendants deny each and every allegation set forth in Paragraph 78 of the Complaint.

79.     Defendants deny each and every allegation set forth in Paragraph 79 of the Complaint.

80.     Defendants deny each and every allegation set forth in Paragraph 80 of the Complaint.

81.     Defendants deny each and every allegation set forth in Paragraph 81 of the Complaint.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**
**(Against Haley)**

82.     Defendants incorporate the responses made to Paragraphs 1 through 81 of the Complaint as if fully set forth herein.

83.     Defendants deny each and every allegation set forth in Paragraph 83 of the Complaint.

84.     Defendants deny each and every allegation set forth in Paragraph 84 of the Complaint.

85.     Defendants deny each and every allegation set forth in Paragraph 85 of the Complaint.

86.     Defendants deny each and every allegation set forth in Paragraph 86 of the

Complaint.

87.    Defendants deny each and every allegation set forth in Paragraph 87 of the Complaint.

88.    Defendants deny each and every allegation set forth in Paragraph 88 of the Complaint.

89.    Defendants deny each and every allegation set forth in Paragraph 89 of the Complaint.

**SECOND CLAIM FOR RELIEF**
**(Tortious Interference with Contractual Relations)**
**(Against AIS)**

90.    Defendants incorporate the responses made to Paragraphs 1 through 89 of the Complaint as if fully set forth herein.

91.    Defendants deny each and every allegation set forth in Paragraph 91 of the Complaint.

92.    Defendants deny each and every allegation set forth in Paragraph 92 of the Complaint.

93.    Defendants deny each and every allegation set forth in Paragraph 93 of the Complaint.

94.    Defendants deny each and every allegation set forth in Paragraph 94 of the Complaint.

95.    Defendants deny each and every allegation set forth in Paragraph 95 of the Complaint.

96.    Defendants deny each and every allegation set forth in Paragraph 96 of the Complaint.

97.     Defendants deny each and every allegation set forth in Paragraph 97 of the Complaint.

## THIRD CLAIM FOR RELIEF
### (Unfair Competition)
### (Against AIS)

98.     Defendants incorporate the responses made to Paragraphs 1 through 97 of the Complaint as if fully set forth herein.

99.     Defendants deny each and every allegation set forth in Paragraph 99 of the Complaint.

100.    Defendants deny each and every allegation set forth in Paragraph 100 of the Complaint.

101.    Defendants deny each and every allegation set forth in Paragraph 101 of the Complaint.

102.    Defendants deny each and every allegation set forth in Paragraph 102 of the Complaint.

103.    Defendants deny each and every allegation set forth in Paragraph 103 of the Complaint.

104.    Defendants deny each and every allegation set forth in Paragraph 104 of the Complaint.

105.    Defendants deny each and every allegation set forth in Paragraph 105 of the Complaint.

106.    Defendants deny each and every allegation set forth in Paragraph 106 of the Complaint.

107.    Defendants deny each and every allegation set forth in Paragraph 107 of the

Complaint.

**FOURTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**
**(Against AIS)**

108.    Defendants incorporate the responses made to Paragraphs 1 through 107 of the Complaint as if fully set forth herein.

109.    Defendants deny each and every allegation set forth in Paragraph 109 of the Complaint.

110.    Defendants deny each and every allegation set forth in Paragraph 110 of the Complaint.

111.    Defendants deny each and every allegation set forth in Paragraph 111 of the Complaint.

112.    Defendants deny each and every allegation set forth in Paragraph 112 of the Complaint.

113.    Defendants deny each and every allegation set forth in Paragraph 113 of the Complaint.

114.    Defendants deny each and every allegation set forth in Paragraph 114 of the Complaint.

115.    Defendants deny each and every allegation set forth in Paragraph 115 of the Complaint.

116.    Defendants deny each and every allegation set forth in Paragraph 116 of the Complaint.

117.    Defendants deny each and every allegation set forth in Paragraph 117 of the Complaint.

118.     Defendants deny each and every allegation set forth in Paragraph 118 of the Complaint.

## FIFTH CLAIM FOR RELIEF
### (Injunctive Relief – Rule 65
### (Against Haley and AIS)

119.     Defendants incorporate the responses made to Paragraphs 1 through 118 of the Complaint as if fully set forth herein.

120.     Defendants deny each and every allegation set forth in Paragraph 120 of the Complaint.

121.     Defendants deny each and every allegation set forth in Paragraph 121 of the Complaint.

122.     Defendants deny each and every allegation set forth in Paragraph 122 of the Complaint.

123.     Defendants deny each and every allegation set forth in Paragraph 123 of the Complaint.

124.     Defendants deny each and every allegation set forth in Paragraph 124 of the Complaint.

125.     Defendants deny each and every allegation set forth in Paragraph 125 of the Complaint.

126.     Defendants deny each and every allegation set forth in the "Wherefore" clause of the Complaint, inclusive of Subparagraphs 1-10, except admit that Pentec seeks the relief described therein.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

127.    The Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

128.    The claims are barred, in whole or in part, by the equitable doctrines of laches, waiver, estoppel, or unclean hands.

### THIRD AFFIRMATIVE DEFENSE

129.    Pentec's claims are barred, in whole or in part, by the applicable statutes of limitations.

### FOURTH AFFIRMATIVE DEFENSE

130.    Pentec's claims are barred, in whole or in part, because at no time did Defendants act in a willful, wanton, reckless and/or malicious manner.

### FIFTH AFFIRMATIVE DEFENSE

131.    Pentec is not entitled to any of the relief sought in the Complaint.

### SIXTH AFFIRMATIVE DEFENSE

132.    Pentec has failed to state facts sufficient to constitute claims for statutory penalties because Defendants acted, at all times, in good faith and had reasonable grounds for believing their conduct complied with applicable laws and regulations.

### SEVENTH AFFIRMATIVE DEFENSE

133.    Pentec's own conduct caused, in whole or in part, whatever damages it purports to have suffered.

### EIGHTH AFFIRMATIVE DEFENSE

134.    The restrictive covenants contained in the Non-Compete Agreement are

unenforceable as a matter of law because there is no legitimate or protectable interest supporting enforcement, because they seek to impose a greater restraint than necessary to protect any legitimate or protectable interest, and because enforcement is contrary to public policy.

### NINTH AFFIRMATIVE DEFENSE

135.    Any claims premised on the misappropriation of confidential information or trade secrets must be dismissed because Pentec has failed to identify any such information with any particularity and because none of the information qualifies as a trade secret.

### TENTH AFFIRMATIVE DEFENSE

136.    Haley did not breach the terms of the Non-Compete Agreement.

### ELEVENTH AFFIRMATIVE DEFENSE

137.    Pentec is not likely to succeed on the merits of its claims against Defendants.

### TWELFTH AFFIRMATIVE DEFENSE

138.    Pentec has not established irreparable harm.

### THIRTEENTH AFFIRMATIVE DEFENSE

139.    The balance of equities favors Defendants.

### FOURTEENTH AFFIRMATIVE DEFENSE

140.    The injunctive relief Pentec seeks is not in the public interest.

### FIFTEENTH AFFIRMATIVE DEFENSE

141.    Pentec's claims for equitable relief are barred because it has an adequate remedy at law.

### SIXTEENTH AFFIRMATIVE DEFENSE

142.    Pentec is not entitled to monetary damages because it has not suffered any economic damages insofar as it has not lost any customers, business opportunities, or employees

by virtue of Defendants' alleged conduct.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

143.    Pentec is not entitled to any monetary damages because the redress that Pentec seeks is speculative, and therefore, not recoverable.

**RESERVATION OF DEFENSES**

Defendants assert the foregoing Affirmative and Other Defenses to the Complaint and claims of Pentec.  Defendants presently have insufficient knowledge or information to form a belief as to whether they may have additional, yet unasserted, affirmative defenses.  Defendants therefore expressly reserve the right to assert additional affirmative defenses in the event discovery or further proceedings indicate such additional defenses would be appropriate.

**COUNTERCLAIMS OF AIS AND/OR HALEY**

For their Counterclaims against Plaintiff-Counterclaim Defendant Pentec, Defendants-Counterclaimants AIS and Haley allege as follows:

**NATURE OF THE COUNTERCLAIMS**

1.    Haley is a modestly paid nurse who has specialized in the provision of intrathecal infusion therapy services to patients with chronic pain and illnesses for over 20 years.  After 15 years of exclusively practicing in this field, she was recruited to Pentec to ply her skills for its benefit.  As a condition of that employment, Pentec forced Haley to execute a "Non-Competition, Non-Solicitation, Confidentiality and Assignment of Inventions Agreement" (the "Non-Compete Agreement"), which prohibits her from working in any capacity for any company anywhere in the United States if that company engages in a "Field of Interest" broadly defined to compete with Pentec.  Pentec contends Haley's current employment with AIS constitutes a breach of the Non-Compete Agreement.

-19-

2.     The Non-Compete Agreement is offensive under Pennsylvania law and unenforceable.  The Non-Compete Agreement is not supported by any protectable interest insofar as: (i) Haley did not have access to confidential information at Pentec, nor did she take any confidential information to AIS; (ii) Haley did not receive any specialized training at Pentec or acquire any knowledge that she had not already developed in her 15 years of prior work exclusively in this field; and (iii) Haley did not, with Pentec, and does not, with AIS, have any ability to impact customer goodwill or influence physician-customers in their selection of Pentec over AIS for the provision of intrathecal care.

3.     This action is the most recent effort of Pentec to realize its strategy of restricting employee mobility, restraining trade, stamping out legitimate and lawful competition, and monopolizing the provision of intrathecal infusion therapy services in Pentec's favor.  Pentec initiated the underlying litigation without conducting even a minimal factual investigation and has continued this litigation despite learning indisputable facts that doom the enforceability of the Non-Compete Agreement, undermine any credible allegations of a breach by Haley of the same, and wholly support Haley and AIS's lawful conduct.  Indeed, Pentec withdrew its request for a temporary restraining order within hours of Defendants' filing their opposition highlighting the baseless nature of this litigation.

4.     The underlying litigation is borne of a corporate strategy and culture steeped in bad faith.  To be sure, Pentec recently agreed to a $17,000,000 settlement with the United States federal government as part of a resolution of a False Claims Act action in which Pentec was alleged to have excessively billed Medicare and other federal healthcare programs from 2007 to 2018.  *See United States ex rel. Bracher v. Pentec Health, Inc.*, No. 13-05745 (E.D. Pa. Feb. 5, 2019).  The settlement further required Pentec to enter into a Corporate Integrity Agreement with the

Department of Health and Human Services, Office of Inspector General that requires regular monitoring of its billing practices for a period of five years.  *See* https://www.justice.gov/usao-edpa/pr/pentec-health-inc-pay-17-million-settle-false-claims-act-allegations.

5.      Likewise, in 2016 and 2017, a Pentec employee impersonated state regulatory agencies and distributed letters to AIS's customers disparaging AIS's pharmacy practices.  Pentec itself confirmed this occurrence, but denied that it had facilitated the scheme.

6.      These Counterclaims – sounding in a request for a Declaratory Judgment regarding the unenforceability of the Non-Compete Agreement, violations of the Sherman Act's prohibition of restraint of trade and attempted monopolization, tortious interference with business relations, unfair competition, and abuse of process – will expose Pentec's improper and legally baseless motives.

## THE PARTIES

7.      Plaintiff-Counterclaim Defendant Pentec Health Inc. is a Pennsylvania corporation with a principal place of business in Pennsylvania.  Pentec describes itself as a "leading provider of Intradialytic Parenteral Nutrition (IDPN) and Intraperitoneal Nutrition (IPN) protein therapies for malnourished dialysis patients."  https://www.pentechealth.com/about/who-we-are

8.      Defendant-Counterclaimant AIS is a Mississippi corporation with a principal place of business in Mississippi.  AIS is a leading provider of advanced sterile, patient-specific intrathecal pump medications and in-home intravenous infusion.

9.      Defendant-Counterclaimant Haley is a natural person residing in the State of Indiana.  Haley is a nurse who has specialized in the provision of intrathecal care to patients for over 20 years, including for 15 years predating her employment with Pentec.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 since the amount alleged to be in controversy exceeds seventy five thousand dollars ($75,000.00), exclusive of interests and costs, and there exists complete diversity of citizenship as Pentec is a citizen of Pennsylvania, AIS is a citizen of Mississippi, and Haley is a citizen of Indiana.

11.     This Court has jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because the Counterclaims form part of the same case or controversy as the claims within the Court's original jurisdiction.

12.     Venue is appropriate in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Pentec resides in this judicial district and a substantial part of the events and/or omissions giving rise to the Counterclaims occurred in this judicial district.

## FACTUAL ALLEGATIONS

**A.      Haley's 15 Years of Experience in Intrathecal Infusion Therapy Prior to her Employment with Pentec Health, Inc.**

13.     Haley began her medical education and career in 1984 and received a variety of degrees and certifications, ultimately receiving her Associate of Science and Nursing Degree in 1996, which qualified her as Registered Nurse.

14.     Haley specialized her nursing career in the administration of pain medication through intrathecal pumps beginning in 1998 when she began employment with Dr. Rodney Chou of the Thompson & Chou Center for Physical Medicine and Rehabilitation as a Clinical Coordinator.

15.     Patients receiving intrathecal treatment have a surgically implanted intrathecal pump through which pain medications are transmitted to the patient through an intrathecal catheter. Nurses treat intrathecal patients in their homes, a doctor's office, or a hospital every 30 to 90 days

and spend 45 to 60 minutes refilling the pump reservoir with medications as directed by the patient's physician and otherwise educating the patient concerning the intrathecal aspect of their medical regimen.

16.     Haley's primary responsibility as a Clinical Coordinator for Dr. Chou was the administration of medications through intrathecal pumps.  For the entirety of her 15 years of employment with Dr. Chou, she was responsible for treating patients in his office or at hospitals, refilling the reservoirs for their intrathecal pumps, and educating patients both pre- and post-pump implant regarding their intrathecal pumps.  Given the length and breadth of Haley's experience with intrathecal pumps, Dr. Chou also tasked her with educating at least three new physicians who joined his practice concerning their use.

17.     In addition to Haley's substantive job responsibilities with intrathecal infusion services, she also received regular training concerning intrathecal pumps, innovations in the field, and new developments concerning intrathecal technologies throughout her 15 years of employment with Dr. Chou.  The bulk of these trainings were performed by Medtronic Neurological, Inc. ("Medtronic"), a manufacturer of intrathecal pumps.  These trainings consisted of classes, off-site training courses, and in-person trainings conducted for Haley alone by Medtronic sales representatives for which she received "certificates" of course completion.

18.     Over the course of her 15 years with Dr. Chou, Haley developed an extensive network with physicians, nurses, and physician offices in and around the Louisville market.  She regularly communicated with these colleagues regarding, among other issues, inter-office patient referrals.  She also developed an expansive patient base in the market, providing intrathecal services to well over 200 patients during her time with Dr. Chou.

**B.**      **Haley is Recruited to Pentec and Forced to Sign an Overbroad and Unenforceable Non-Compete Agreement**

19.      Haley began employment with Pentec on or about July 8, 2013 as a Staff nurse after her prior employer, Dr. Chou, accepted a Medical Director position with Pentec.  In this role she was paid an annual salary of approximately $77,000 together with $.55/mile for work travel.

20.      Pentec required Haley to sign a "Non-Competition, Non-Solicitation, Confidentiality and Assignment of Inventions Agreement" (the "Non-Compete Agreement") as a condition of her employment with Pentec.  *See* Ex. A.  The Non-Compete Agreement provided, in relevant part:

> (a)      Except as otherwise specifically provided in this Agreement, during the period in which you are employed by or engaged as a consultant by the company and for a period of one (1) year following the end of your relationship with the company (i.e. the final day on which you are an employee or consultant to the Company) (the "Term"), irrespective of who ends the relationship or why, you shall not without the prior written consent of the Company:

> (i)      In your personal capacity or on behalf of any other, directly or indirectly, either as principal, agent, stockholder, employee, director, consultant, representative or in any other capacity, compete with the Company or own, manage, operate or control, or be concerned, connected or employed by, or otherwise associate in any manner with, engage in or have financial interest in any business in the Company's Field of Interest within the United States (the "Restricted Territory").  Field of Interest is defined as follows: (A) the administration of medications, nutrients or other solutions and therapies (including anti-infectives, chemotherapy, pain management, parental and enteral nutrition, inotropic therapy, hydration therapy, immunotherapy, blood transfusion, steroid therapy, tocolytic therapy, growth hormones and the like) by a qualified home infusion therapy provider to individuals in their homes, nursing facilities or settings other than hospitals ("Home Infusion.").  Home Infusion also includes the provision of professional services (such as nursing services) as well as supplies and equipment needed to administer medications, nutrients or other solutions or therapies to individuals in their homes, nursing facilities or settings other than hospitals; and (B) the operation of a coordinated systems of pharmacological care, administration and monitoring for patients with chronic illnesses and complex medical conditions, which includes dispensing and distributing (via mail order and otherwise) injectable and infusible high cost medicinal preparations and therapies to patients who are undergoing intensive therapies for illnesses that are generally chronic, complex and potentially life threatening.  For purposes of this Agreement, a business will be deemed competitive with the Company if it engages in a line of business in the

Field of Interest; provided that nothing contained herein shall preclude you from purchasing or owning stock in any such competitive business if such stock is publicly traded, and provided that your holdings do not exceed one (1.0%) percent of the issued and outstanding capital stock of such business.

(ii)     Either individually or on behalf of or through any third party, directly or indirectly solicit, divert or appropriate or attempt to solicit, divert or appropriate, for the purpose of competing in the Field of Interest with the Company, any joint venture or collaborative research partners, patients, customers, referral sources of patrons of the Company, or any prospective patients, customers, referral sources or patrons with respect to which the Company has developed or made a presentation for the use or exploitation of products or processes in the Field of Interest, located within the Restricted Territory.

Ex. A at ¶ 3(a)(i)-(ii).

21.     Upon information and belief, Pentec required other nurses who provided intrathecal care to execute the same Non-Compete Agreement.

22.     Haley's primary responsibility at Pentec was nearly identical to that she performed while employed by Dr. Chou: she met patients, refilled their intrathecal pumps, and provided them with support and education.  The only difference between her employment with Dr. Chou and with Pentec was that she visited patients in their homes and she served a larger geographical area consisting of Kentucky, Ohio and Southern Indiana.

23.     Haley did not receive – nor did she need – any training from Pentec concerning intrathecal pumps at the time she was hired given her 15 years of prior experience using, and training others how to use, intrathecal pumps.   The only training she received was on administrative matters, such as Pentec's paperwork, its recordkeeping procedures, and its computer system, which housed patient records.

24.     In or around March 2015, Haley became a Traveler Nurse and Preceptor. In this role, she performed the same substantive responsibilities she had as a Staff Nurse, but now traveled four to five days per week to provide intrathecal infusion services to patients in a broader geographical area.

25.     In or around July 2016, and because of her intrathecal expertise, Haley became a Nurse Educator for Pentec.  She continued to travel for approximately 60-70% of her working time, but she also began providing classroom instruction on intrathecal infusion therapy to new Pentec nurses.  The bulk of the instruction she provided concerned patient safety and the general use and administration of medications through intrathecal pumps.  Only a small portion of the training concerned Pentec itself, and at that, consisted mainly of administrative matters like how to complete Pentec paperwork and use Pentec's computer system.

26.     Pentec disbanded its Education Department in December 2017 and eliminated the Nurse Educator role. Haley returned to working as a Nurse Traveler and Preceptor and resumed her full-time travel schedule providing intrathecal patient care.

27.     At that time, she requested a role that did not require travel so that she could care for her 91-year-old mother.  Pentec repeatedly told her it did not have an alternative position available.  Accordingly, on or about December 13, 2018, Haley was left with no choice but to resign.

28.     At no time during her employment with Pentec did Haley have access to Pentec's confidential information and she did not take any Pentec information with her upon her resignation from Pentec.

29.     At no time during her employment with Pentec did Haley influence, or have the opportunity to influence, physicians and/or patients concerning which service provider to use for purposes of intrathecal care.

30.     At no time during her employment with Pentec did Haley make decisions with respect to the type of treatment a patient received, how much the treatment cost, the dosage of the treatment, the number of times she visited a patient, or which patients she visited.

C.   **Haley Seeks and Accepts Employment with AIS in an Entirely Different Role**

31.   Haley learned of a job opportunity at AIS through a Medtronic sales representative with whom she had developed a relationship while working for Dr. Chou prior to Pentec.  She contacted AIS in search of an opportunity that would require less travel and that would pay her competitively.  AIS hired her as a Special Project Nurse on or about January 7, 2019.

32.   As a Special Project Nurse for AIS, Haley did not have responsibility for providing intrathecal infusion therapy services.   Instead, her primary responsibility was to serve in an administrative capacity as a resource to referral sources, patients, and the AIS healthcare team and community home health agencies.

33.   Haley did not bring any Pentec information with her to her employment at AIS and it would not have provided any value given that she was not providing intrathecal care to patients. She did not have any responsibility for providing any direct patient care, for training other AIS nurses, or for business development or establishing physician or patient relationships.

34.   Despite her new role, for a brief period of time, an emergent situation required her to provide care to intrathecal patients.  Specifically, in mid-April 2019, Elise Morgan, an AIS nurse who serviced the intrathecal patients of Dr. Humam Akbik throughout Ohio, ceased her employment with AIS because of the stress of a lawsuit that Pentec initiated against her.  Ms. Morgan together with just two other nurses were primarily responsible for servicing more than 120 patients of Dr. Akbik.  When Ms. Morgan left, AIS did not have any other intrathecal nurses who were not already carrying a full patient load and who held an Ohio license aside from Haley.  The lack of resources presented not only administrative concerns, but more importantly, patient safety concerns as well.

35.   AIS  determined that a replacement for Ms. Morgan was necessary.  AIS directed

two current AIS nurses to obtain Ohio licensure, which they did in May 2019, and hired a new full-time and new part-time nurse without intrathecal experience to be deployed in Ohio in September or October 2019 once their training is complete. However, until these replacements were deployed in the market, AIS assigned Haley on a temporary basis because of her Ohio licensure and her 20+ years of intrathecal care experience. The replacement nurses were fully deployed as of mid-June 2019 and AIS divested Haley of any continuing responsibilities for servicing these patients.

36.     Haley had not serviced Dr. Akbik or his patients during her employment with Pentec. Even during her time at AIS, Haley did not have any role in influencing Dr. Akbik or his patients as to which service provider (Pentec or AIS) to use. Dr. Akbik had, in fact, become an AIS customer beginning in early 2018 and by October 2018 – three months before Haley's employment with AIS – executed an agreement designating AIS as the exclusive intrathecal care provider for his patients through, at least, October 2019.

37.     Haley has not provided intrathecal care to any physician or patient whom she serviced while employed by Pentec.

**D.     Pentec Recognizes the Non-Compete Agreement it Forced Haley and Other Nurses to Sign Was Unenforceable and Disseminated Replacement Agreements to its Nurses**

38.     In or around January 2018, Pentec distributed a new non-compete to its nurses with restrictions that were drastically narrower (yet still overly broad) than that imposed upon Haley in recognition of the unenforceability of Haley's Non-Compete Agreement and those like it imposed upon other nurses.

39.     In distributing these new non-compete agreements to its nurses, Pentec acknowledged that they were "designed to better reflect the natural evolution of [Pentec's] business and [were] intended to ensure that all similarly-situated employees have the same post-

employment obligations."  Pentec further added that the new non-compete agreement "narrows the scope of certain post-employment restrictions and in some cases reduces the period of time of these restrictions."

40.     Specifically, the new non-compete agreements provide, in relevant part:

(a)     During Employee's employment with the Company and for one year following the date of Employee's termination from the company for any reason, with or without cause, Employee shall not, in Employee's personal capacity or on behalf of any other, directly or indirectly, either as principal, agent, stockholder, employee, director, consultant, representative, or an any other capacity, provide services in the United States (the "Restricted Territory") to any competitor or customer in the Company's Field of Interest or provide services to any patient that Employee treated while employed with Company.  For purposes of this agreement, the Company's "Field of Interest" refers to: (i) preparing and dispensing of renal nutrients and therapies that address protein malnutrition in dialysis patients suffering from end-stage renal disease or pain management and spasticity medicine used in intrathecal pumps pursuant to Section 503A of the Federal Food, Drug and Cosmetic Act; (ii) the administration of pain management or spasticity medicine by a qualified home infusion therapy provider to individuals in their homes, nursing facilities or settings other than hospitals; (iii) marketing, sales and production of drug compounds as a Human Drug Outsourcing Facility under Section 503B of the Federal Food, Drug and Cosmetic Act; and (iv) such other services or therapies that Company may provide to customers or patients during the course of Employee's employment with Company.

**E.     Pentec Initiates Litigation Against Another Former Pentec Nurse**

41.     On or about March 19, 2019, Pentec filed a Complaint and Motion for Temporary Restraining Order and Preliminary Injunction against Elise Morgan, a former Pentec and then current AIS employee, and AIS in the Court of Common Pleas, Hamilton County, Ohio.  *See Pentec Health Inc. v. Elise Morgan and Bond Pharmacy Inc., d/b/a AIS Healthcare*, Case No. A1901405.

42.     Pentec's Complaint against Ms. Morgan and AIS was based on an entirely different non-compete agreement with restrictions that were wholly different than that found in Haley's Non-Compete Agreement.  Further, Ms. Morgan was employed by AIS in a completely different capacity than Haley.

43.     The Court of Common Pleas held argument on March 20, 2019 and granted the TRO on April 5, 2019.

44.     On April 23, 2019, Pentec voluntarily dismissed the *Morgan* case against AIS.

45.     The stress of the case, together with Ms. Morgan's status as a new mother, prompted Ms. Morgan to resign her employment from AIS.  Upon information and belief, Ms. Morgan has since filed a charge of discrimination and/or lawsuit alleging claims of unlawful discrimination against Pentec.

**F.     Pentec Threatens Haley with Litigation if she Refused to Return to Work at Pentec**

46.     In or around June 2019, Pentec began to harass Haley and threaten her with litigation if she continued her employment with AIS and/or refused to rejoin Pentec.

47.     For example, in or around June 2019, Karen McHenry, Pentec's Senior Vice President of Nursing, sent Haley a letter, stating in relevant part:

> I hope you remember our conversation last December about returning to Pentec in the future, should your needs change.  I understand that you have returned to work. I am interested in discussing whether you would be interested in returning to the Pentec nursing team.  We currently have pool opportunities, and are actively meeting with potential providers in your area.  I would enjoy discussing your return.

> I also need to address that a patient has reported that you started to work for AIS in the provision of intrathecal infusion therapies.  This is an issue of significant concern to Pentec given the Non-Competition, Non-Solicitation, Confidentiality and Assignment of Inventions Agreement to which you agreed…The Agreement restricts you from providing intrathecal infusion services to any competitor, including AIS, for one year after you left Pentec on December 31, 2018.

> The patient that reported you also stated that you are flying to Cincinnati to treat Dr. Akbik's patients.  *This work violates the Agreement and Pentec is extremely concerned about this development.  I really need to discuss this with you so you know how significant of an issue this is and to see if there is a way to avoid a lot of angst and heartache.  We recently went through this with another former employee in the Cincinnati, OH area who went to work for AIS in violation of her agreement and was ultimately terminated by AIS.*  As I mentioned above, I would love to see you rejoin the team.  Your violation would not be an issue of concern should you return to Pentec.

Ex. B (emphasis added).

48.      Ms. McHenry and other Pentec personnel, including Michelle Hidell, also contacted Haley multiple times by phone concerning the same issue.

**G.      Pentec Initiates the Instant Litigation Without an Adequate Investigation and Continues the Litigation in Bad Faith**

49.      Pentec filed the underlying Complaint in this action on June 20, 2019 against Haley and AIS alleging a host of claims including breach of contract, unfair competition, and tortious interference with business relations.

50.      On June 21, 2019, Pentec filed a Motion for Temporary Restraining Order, Preliminary Injunction, and Other Relief (the "Motion"), contending that it would suffer irreparable harm if Haley provided intrathecal services for AIS any time prior to December 31, 2019 because of her Non-Compete Agreement.  The Motion was supported solely by the "information and belief" allegations in the Complaint and the declaration of Pentec's General Counsel, Jeffrey Baker, Esq.

51.      On June 25, 2019, Haley and AIS filed their Opposition to the Motion and highlighted a number of facts that Pentec should have discovered had it undertaken even a minimal inquiry prior to filing this action including, but not limited to: (i) Haley had 15 years of experience providing exclusively intrathecal care to patients prior to joining Pentec; (ii) her role at AIS was entirely different than that which she performed at Pentec (and for 15 years prior thereto) except for a brief time when a patient care emergency required her to provide intrathecal care; and (iii) she did not provide intrathecal care to any patients or physicians with whom she had worked at Pentec.

52.      Mere hours after Haley and AIS filed the Opposition, Pentec filed a "Notice of Withdrawal, Without Prejudice, of Its Motion for Temporary Restraining Order, Preliminary

Injunction, and Other Relief and Request for Expedited Discovery." Therein, Pentec contended that AIS had failed to provide it with information in advance of its filing of the Complaint and Motion that would have allowed it to avoid seeking emergency relief.

53.     On June 28, 2019, Pentec filed a "Motion for Preliminary Injunction and Other Relief." The Memorandum filed in support of this Motion was nearly identical to that previously filed in support of a temporary restraining order, including its repeated references to the necessity of a temporary restraining order and including the allegations that Pentec now knew to be incorrect given the evidence submitted by AIS and Haley in support of their Opposition to the original Motion.

54.     Importantly, there were no new factual developments between the time Pentec withdrew the original Motion on the grounds that it was filed without the benefit of the information included in AIS and Haley's Opposition, and the time Pentec effectively refiled the same motion including the same allegations and demands for relief. Pentec has no reasonable basis in fact or law for continuing this action and is doing so to harass AIS and Haley and gain an unfair competitive advantage.

## COUNT I: DECLARATORY JUDGMENT
## DECLARATORY JUDGMENT THAT THE NON-COMPETE
## AGREEMENT IS VOID AND UNENFORCEABLE

55.     AIS and Haley repeat and reallege the allegations contained in Paragraphs 1 through 54 above as if fully set forth herein.

56.     Pursuant to 28 U.S.C. § 2201(a), AIS and Haley seek a declaration regarding her rights under and the unenforceability of the Non-Compete Agreement and AIS's accompanying right to hire her (and other nurses subject to the same Non-Compete Agreement) and employ her

to provide intrathecal infusion therapy services without aiding and abetting a breach of the Non-Compete Agreement.

57.     An actual case and controversy exists concerning whether the Non-Compete Agreement is enforceable and, if so, whether Haley's employment with AIS violates the Non-Compete Agreement and whether AIS's employment of Haley aids and abets Haley's breach of the Non-Compete Agreement.  AIS and Haley's interests in this controversy is direct, present, immediate and substantial.

58.     Pentec selected Pennsylvania law to govern the enforceability of the Non-Compete Agreement.  *See* Ex. A at ¶5(d).  Under Pennsylvania law, post-employment restrictive covenants are generally "disfavored as a restraint on trade[.]" *CentiMark Corp. v. Jacobsen*, No. 11-1137, 2011 WL 5977668, at *5 (W.D. Pa. Nov. 29, 2011).  "[B]ecause non-competition agreements restrain an employee's ability to practice his or her chosen trade, they are 'strictly construed against the employer.'" *Colorcon, Inc. v. Lewis*, 792 F. Supp. 2d 786, 797 (E.D. Pa. 2011) (quoting *All-Pak, Inc. v. Johnston*, 694 A.2d 347, 351 (Pa. Super. Ct. 1997)).  Pennsylvania courts particularly scrutinize non-competition agreements in the field of health care, where an injunction could "'deprive the community involved of a desperately needed service.'" *Wound Care Ctrs.*, *Inc. v. Catalane*, No. 10-336, 2011 WL 553875 at *26 (W.D. Pa. Feb. 8, 2011) (quoting *New Castle Orthopedic Ass'n v. Burns*, 392 A.2d 1383, 1387-88 (Pa. 1978)).

59.     Pennsylvania courts refuse to enforce non-compete agreements unless they are "(1) incident to an employment relation between the parties to the covenant, (2) the restrictions are reasonably necessary for the protection of the employer, and (3) the restrictions are reasonably limited in duration and geographic extent." *Fres-Co Sys. USA, Inc. v. Bodell*, No. 05-3349, 2005 WL 3071755, at *3 (E.D. Pa. Nov. 15, 2005) (internal quotation marks and citations omitted).

60. Here, there is no legitimate or protectable business interest supporting enforcement of the Non-Compete Agreement. "A restrictive covenant is reasonably necessary for the protection of the employer when it is narrowly tailored to protect an employer's *legitimate* interests." *PharMethod, Inc. v. Caserta*, 382 F. App'x 214, 220 (3d Cir. 2010) (emphasis in original). Legitimate business interests recognized in Pennsylvania are "trade secrets or confidential proprietary information, customer goodwill, and unique or extraordinary skills developed through specialized training." *SunGard Bus. Sys., LLC v. McCloskey*, No. 2013–07190, 2013 WL 10872120, at *10 (Pa. Com. Pl. Nov. 1, 2013).

61. First, Haley did not receive any specialized training concerning intrathecal infusion therapy services while employed by Pentec. She developed her expertise in providing intrathecal infusion therapy to patients over the course of 15 years of employment prior to Pentec. While Pennsylvania courts recognize that "unique or extraordinary skills developed through specialized training" may be a protectible interest, such training must be "unique" and impart "proprietary knowledge and skills." *Wound Care Ctrs., Inc. v. Catalane*, No. 10–336, 2011 WL 553875 at *22 (W.D. Pa. Feb. 8, 2011); *Ride the Ducks LLC v. Duck Boat Tours, Inc.*, No. Civ.A 04-CV-5595, 2005 WL 670302, at *12 (E.D. Pa. Mar. 21, 2005). Critically, a specialized training program does not give rise to a legitimate business interest where it does not provide the employee with any new skills. *Wound Care Ctrs.*, 2011 WL 553875, at *22 (training that served only as a "refresher course" was not a legitimate business interest); *Ride the Ducks*, 2005 WL 670302, at *13 (specialized training not a legitimate business interest where employee "already possessed several of the skills that [the employer] characterizes as proprietary").

62. Second, Haley did not have access to any confidential information during her employment with Pentec, she did not take any confidential information with her to her employment

at AIS, and any confidential information would be of no value to her or AIS in her employment at AIS given that she is performing a completely different role than what she performed at Pentec. Indeed, it is notable that Pentec does not advance a claim for misappropriation of trade secrets or otherwise lodge any specific allegations concerning confidential information as would be expected if this was suspected by, or a concern of, Pentec.

63.     And third, there is no customer goodwill that could constitute a legitimate business interest supporting enforcement of the Non-Compete Agreement.  Haley has little contact with AIS physicians in her role as a Special Project Nurse, has no business development responsibilities, and has not solicited any of the physicians or patients she served at Pentec.  She has no control over the patients she serves and no ability to influence a doctor's decision to use one intrathecal infusion services provider over another.  *See, e.g.*, *CentiMark*, 2011 WL 5977668, at *14-15 (preliminary injunction would not issue where employee performed different services for new employer and had no sales responsibilities).

64.     Even putting aside the absence of a legitimate and protectable interest supporting enforcement of the Non-Compete Agreement, the geographic and temporal restrictions are also too broad to support enforcement of the Non-Compete Agreement.  The Non-Compete Agreement impermissibly extends throughout the entire United States, beyond the territory serviced by Haley. *See Adhesives Research, Inc. v. Newsom*, No. 1:15-cv-0326, 2015 WL 1638557, at *6 (M.D. Pa. Apr. 13, 2015) (holding non-compete with unlimited geographic scope overbroad and unenforceable when "at the time the parties entered the contract, plaintiff knew that defendant's sales territory would consist of the western half of the United States").

65.     The one-year temporal restriction is equally overbroad because it impermissibly imposes an "undue hardship" on Haley given that the provision of intrathecal infusion therapy

services has been her exclusive line of work for more than 20 years.  *See Insulation Corp. of Am. v. Brobston*, 667 A.2d 729, 737-38 (Pa. Super. Ct. 1995) (noting that non-compete provision must not impose undue hardship on employee).

66.     The scope of services the Non-Compete Agreement seeks to prevent Haley from providing are also too overbroad to support enforcement.  The Non-Compete Agreement does not just prevent her from providing intrathecal infusion therapy services to a competitor, but instead prohibits her from providing any services whatsoever if her prospective employer is itself engaged in a business that qualifies as within Pentec's "Field of Interest."  By its terms, Haley could not even provide janitorial services to AIS.

67.     Such naked anticompetitive behavior is wholly disfavored under Pennsylvania law.  *See PharMethod*, 382 F. App'x at 220 (overbroad restrictive covenants "suggest[] an intent to oppress the employee and/or to foster a monopoly, either of which is an illegitimate purpose . . . Accordingly, [a]n employer who extracts a covenant in furtherance of such a purpose comes to the court of equity with unclean hands and is, therefore, not entitled to equitable enforcement of the covenant") (internal quotation marks and citations omitted); *Fres-Co*, 2005 WL 3071755, at *4 (noting that non-competes "may not be used to eliminate or repress competition or to keep the employee from competing so that the employer can gain an economic advantage") (internal quotation marks and citations omitted).

68.     Further, enforcement of the Non-Compete Agreement (and any like it) is contrary to the public's interest.  Pennsylvania recognizes the public interest in promoting employee mobility in competitive marketplaces, especially in the medical profession.  *See Wound Care Ctrs.*, 2011 WL 553875 at *25.

69.     Finally, because of the gross overbreadth of the Non-Compete Agreement, the Court should declare it unenforceable outright and refrain from modifying, or "blue-penciling," the Non-Compete Agreement.   "[G]ratuitous over-breadth militates against any enforcement whatsoever." *See PharMethod*, 382 F. App'x at 220.   As the Superior Court of Pennsylvania recently echoed in *Wolfington Body Co. v. O'Neill*:

> To invoke the court's power to modify [an overbroad] restrictive covenant would effectively encourage a policy whereby employers could impose the most broad restraints on an employee as a condition of employment, without consideration for the reasonableness or enforceability of such provisions, resting comfortably on the court's power to modify the agreement if or when the employer sought to enforce the restrictive covenants.   Because this Commonwealth disfavors restrictions on trade, it follows that the court should exercise its power to modify a restrictive covenant only in the most deserving of cases.

No. 67 EDA 2017, 2018 WL 2011398, at *10 (Pa. Super. Ct. Apr. 30, 2018).

WHEREFORE, AIS and Haley respectfully request the Court enter an Order declaring that:

a.     The Non-Compete Agreement is unenforceable insofar as it not supported by any legitimate or protectable interest;

b.     The Non-Compete Agreement is unenforceable insofar as the geographic and temporal restrictions are overbroad;

c.     The Non-Compete Agreement is unenforceable insofar as it restricts Haley from providing any services to any company in the United States in any capacity if that Company engages in a "Field of Interest" Pentec identifies as competitive;

d.     The Non-Compete Agreement is unenforceable as contrary to public policy;

e.     The Non-Compete Agreement is so gratuitously overbroad that it is not entitled to reformation, or "blue-penciling," and should be declared unenforceable outright;

f.     Haley has not breached the Non-Compete Agreement and Haley may perform any services for AIS, including providing intrathecal care to patients and/or physicians with

whom she worked at Pentec, without breaching the unenforceable Non-Compete Agreement;

g.     AIS has not aided and abetted a breach of the Non-Compete Agreement and AIS can employ Haley to perform any services it sees fit, including providing intrathecal care to patients and/or physicians with whom she worked at Pentec, without breaching the unenforceable Non-Compete Agreement;

h.     Haley and AIS are entitled to their attorneys' fees and costs as provided for under Paragraph 5(f) of the Non-Compete Agreement as the prevailing party; and

i.     AIS and Haley are entitled to such other and further relief as the Court deems just and proper.

## COUNT II: VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1 CONTRACT TO RESTRAIN TRADE

70.     AIS repeats and realleges the allegations contained in Paragraphs 1 through 69 above as if fully set forth herein.

71.     Under Section 1 of the Sherman Act, 15 U.S.C. §1, every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of interstate trade or commerce is illegal.

72.     Pentec forced Haley and its other nurses to enter into agreements that contain anticompetitive restrictive covenants lasting at least one (1) year and covering the entire United States notwithstanding the specific locations in which Haley and other nurses worked.

73.     The restrictions are overbroad and unreasonable because they are not limited to the types of services Haley and other nurses provided for Pentec.  Instead, they prevent Haley and other nurses from providing any services to any company in the United States if that company provides services that Pentec deems to fall within its "Field of Interest."

74. The purpose and effect of the restrictions is to prevent Haley and other Pentec nurses from obtaining employment with a competitor such as AIS, which adversely impacts employee mobility.

75. The restrictions also inhibit AIS's ability to compete with Pentec as they drastically limit the pool of qualified nurses whom AIS and other potential competitors can hire. Without nurses who are qualified to provide intrathecal medication services to patients, AIS will be driven out of the market.

76. The Non-Compete Agreement and the accompanying restrictions are also unenforceable, illegal restraints on trade because they are unsupported by a legitimate protectable interest.

77. The Non-Compete Agreement and the accompanying restrictions produce adverse, anticompetitive effects within the intrathecal medication services industry in the United States and are therefore illegal restraints on trade.

78. AIS has been injured as a direct and proximate result of Pentec's Non-Compete Agreement with Haley and Pentec's nurses. AIS is suffering from a shortage of nurses like Haley who are qualified to provide intrathecal services and licensed in all of the jurisdictions in which AIS operates. For example, Haley is unable to provide intrathecal infusion services without the looming threat of a lawsuit. Elise Morgan resigned her employment with AIS in response to Pentec's initiation to a similar lawsuit against her.

79. AIS often has to assume the travel costs and additional wages of transporting nurses from other jurisdictions to address patient and physician needs, which is an unfeasible practice. AIS will not be able to continue to provide intrathecal medication services in the jurisdictions in which it operates, and will be pushed out of those markets, leaving Pentec as the only providers in

those markets.  Patients whose conditions require intrathecal infusion therapies will have no choice but to use Pentec.

80.     Without competition, Pentec will have the power to set prices unreasonably high, injuring this vulnerable population of patients.

WHEREFORE, AIS and Haley respectfully request that the Court enter judgment in their favor and against Pentec on Count II in an amount threefold AIS and Haley's actual damages pursuant to 15 U.S.C. § 15(a), plus prejudgment interest, costs, and attorneys' fees attributed to Pentec's violations of 15 U.S.C. § 1 as alleged herein, and for such other and further relief as the Court deems appropriate.

### COUNT III: VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2 ATTEMPTED MONOPOLIZATION

81.     AIS repeats and realleges the allegations contained in Paragraphs1 through 80 above as if fully set forth herein.

82.     Under Section 2 of the Sherman Act, 15 U.S.C. § 2, it is illegal to monopolize or attempt to monopolize any part of interstate trade or commerce.

83.     Pentec has a specific intent to monopolize the intrathecal medication services market in any market in which AIS competes and to destroy competition, which can be inferred from its anticompetitive conduct.

84.     Pentec forces its nurses, like Haley, to sign unreasonable, overbroad, and anticompetitive agreements containing restrictive covenants lasting at least one (1) year and covering the entire United States notwithstanding the specific locations in which Haley and other nurses worked.

85.     The restrictions are overbroad and unreasonable because they are not limited to the types of services Haley and other nurses provided for Pentec.  Instead, they prevent Haley and

other nurses from providing any services to any company in the United States if that company provides services that Pentec deems to fall within its "Field of Interest."

86.     The purpose and effect of the restrictions is to prevent Haley and other Pentec nurses from obtaining employment with a competitor such as AIS, which adversely impacts employee mobility.  For example, Haley is unable to provide intrathecal infusion services without the looming threat of a lawsuit.  Elise Morgan resigned her employment with AIS in response to Pentec's initiation to a similar lawsuit against her.

87.     The restrictions on servicing Pentec patients are also unreasonable because nurses like Haley do not decide which patients they treat.  Rather, doctors refer patients to a service provider, and the service provider assigns nurses to patients.

88.     The restrictions also inhibit AIS's ability to compete with Pentec as they drastically limit the pool of qualified nurses whom AIS and other potential competitors can hire.

89.     Without nurses who are qualified to provide intrathecal medication services to patients, AIS will be driven out of the market.

90.     The Non-Compete Agreement and the accompanying restrictions are also unenforceable, illegal restraints on trade because they are unsupported by a legitimate protectable interest.

91.     Pentec has a dangerous probability of achieving monopoly power in all jurisdictions in which AIS currently operates.  Patients whose conditions require intrathecal infusion therapies will have no choice but to use Pentec.  Without competition, Pentec will have the power to set prices unreasonably high, injuring this vulnerable population of patients.

92.     AIS has been injured as a direct and proximate result of Pentec's Non-Compete Agreement with Haley and Pentec's nurses.

WHEREFORE, AIS and Haley respectfully request that the Court enter judgment in their favor and against Pentec on Count III in an amount threefold AIS and Haley's actual damages pursuant to 15 U.S.C. § 15(a), plus prejudgment interest, costs, and attorneys' fees attributed to Pentec's violations of 15 U.S.C. § 2 as alleged herein, and for such other and further relief as the Court deems appropriate.

### COUNT IV: UNFAIR COMPETITION

93.   AIS repeats and realleges the allegations contained in Paragraphs 1 through 92 above as if fully set forth herein.

94.   Pentec and AIS are direct competitors, as both companies provide intrathecal medication services throughout the United States.

95.   Pentec filed this lawsuit in bad faith, without any objective basis, and with the subjective intent to destroy AIS's ability to compete.

96.   Pentec's lawsuit is baseless because, *inter alia*, the restrictions set forth in the Non-Compete Agreement on which many of its claims are based are plainly overbroad and unenforceable illegal restraints on trade.

97.   Pentec is aware that the Non-Compete Agreement is unenforceable evidenced by the fact that Pentec imposed new agreements with substantially narrower restrictions than those imposed on Haley beginning in January 2018.

98.   Pentec filed this lawsuit maliciously and for the purpose of harassing and injuring Haley and AIS.

99.   Pentec is using the costs of this lawsuit to drive AIS out of business and destroy competition.

100.     As AIS is Pentec's chief competitor, without AIS, Pentec will face little to no competition.

101.     AIS has been injured as a direct and proximate result of Pentec's lawsuit.  AIS has incurred various otherwise avoidable costs and expenses in paying the travel costs and additional wages of other nurses qualified to perform intrathecal therapy services and licensed in the jurisdictions in need of coverage because of this lawsuit.  AIS has also incurred attorneys' fees and costs in defending this action, including in preparing an opposition to the Motion for a Temporary Restraining Order that Pentec withdrew just hours after AIS filed its opposition.

102.     AIS is entitled to compensatory damages, including, but not limited to, lost profits, expenses, costs, fees and other losses to be proven at trial due to Pentec's conduct.

103.     Pentec acted with malice, thus entitling AIS to punitive damages, together with interest, costs and attorneys' fees.

WHEREFORE, AIS and Haley respectfully request that the Court enter judgment in their favor and against Pentec on Count IV in an amount to be determined at trial, plus accruing interest, costs, and attorneys' fees attributed to Pentec's unfair competition as alleged herein, and for such other and further relief as the Court deems appropriate.

## COUNT V: TORTIOUS INTERFERENCE
## WITH PROSPECTIVE CONTRACTUAL RELATIONS

104.     AIS repeats and realleges the allegations contained in Paragraphs 1 through 103 above as if fully set forth herein.

105.     By the acts set forth in these Counterclaims, Pentec has attempted to, and has, tortiously interfered with AIS's reasonable expectation of economic advantage and prospective contractual relationships with nurses and physicians (together with their patients) in need of intrathecal infusion therapy services.

106.     Pentec intended to harm AIS by unfairly competing using agreements with overbroad and unenforceable restrictions limiting employee mobility and preventing AIS from hiring qualified nurses to provide intrathecal infusion therapy services to its physicians (together with their patients).  For example, Haley is unable to provide intrathecal infusion services without the looming threat of a lawsuit.  Elise Morgan resigned her employment with AIS in response to Pentec's initiation to a similar lawsuit against her.

107.     Further, Pentec personnel have disparaged AIS in the marketplace and one Pentec employee has gone so far as to impersonate state regulators to disparage AIS.

108.     Through its actions, Pentec has gained an unfair economic advantage over AIS.

109.     Pentec's conduct was without privilege or justification and was undertaken in bad faith.

110.     AIS is entitled to compensatory damages, including, but not limited to, lost profits, expenses, costs, fees and other losses to be proven at trial due to Pentec's conduct.

111.     Pentec acted with malice, thus entitling AIS to punitive damages, together with interest, costs and attorneys' fees.

WHEREFORE, AIS and Haley respectfully request that the Court enter judgment in their favor and against Pentec on Count V in an amount to be determined at trial, plus punitive damages, accruing interest, costs, and attorneys' fees attributed to Pentec's tortious interference with prospective contractual relations as alleged herein, and for such other and further relief as the Court deems appropriate.

## COUNT VI: COMMON LAW ABUSE OF PROCESS

112.     AIS and Haley repeat and reallege the allegations contained in Paragraphs 1 through 110 above as if fully set forth herein.

113.    The Pennsylvania Supreme Court has stated that "[t]he gist of an action for [common law] abuse of process is the improper use of process after it has been issued, that is, a perversion of it." *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 304 (3d Cir. 2003) (citation and internal quotations omitted); *see also Horizon Hous. Dev. Servs. Inc. v. Twp. of Upper Southampton*, No. 89-2243, 1990 WL 151795, at *2 (E.D. Pa. Oct. 4, 1990).

114.    Pentec has used a legal process, namely this litigation, against AIS and Haley primarily to accomplish a purpose or purposes for which that process was not designed, and as a result, Haley and AIS have suffered damages.

115.    Specifically, Pentec's true and primary purposes, not just in filing this lawsuit but in maintaining it, are to limit employee mobility, prevent Haley from plying the skill and trade she developed over the course of 20 years, effect a restraint on trade, establish a monopoly, cause AIS to incur fees and costs, and otherwise unlawfully interfere with AIS's legal competitive activities in providing intrathecal infusion therapy services to its physician customers (together with their patients).

116.    Pentec has sought to further that purpose by, among other things, filing a Complaint and Motion for a Temporary Restraining Order without conducting even a minimal investigation of the facts to determine whether its allegations had a reasonable basis, withdrawing its Motion for a Temporary Restraining Order after causing AIS to incur the costs to oppose the same, and refiling the Motion in effectively the same form two days later despite there being no legal or factual developments in the interim.

117.    Pentec has further sought to advance that purpose by supporting its Complaint with the Declaration of Jeffrey Baker, Esq., in which he attributes a quote without any context to John Finley, Esq., AIS's General Counsel, with full knowledge that any such statements were made

during the course of settlement discussions and are therefore inadmissible pursuant to Federal Rule of Evidence 408.

118.    Pentec has also filed various motions with this Court without even attempting to "meet and confer" or otherwise avoid burdening the Court, revealing its intent to improperly drive up AIS's attorneys' fees.

119.    Indeed, most egregiously, Pentec has further sought to advance that purpose despite knowing that Haley is not engaging in any competitive activity that could be deemed unlawful under any reasonable interpretation of the Non-Compete Agreement.

120.    By continuing to make allegations that it now knows to be untrue and continuing to pursue this action, often without adherence to procedural expectations, Pentec has engaged and continues to engage in an abuse of the legal process.

121.    AIS and Haley have been harmed as a result of Pentec's abuse of process and are entitled to money damages, including, but not limited to, the expenditure of attorneys' fees and costs to defend against Pentec's meritless claims.

## **JURY TRIAL**

122.    Defendants demand a trial by jury.

**WHEREFORE**, the Defendants seek judgment in their favor and against Pentec:

(a)    Denying all relief sought by Pentec and dismissing the Complaint in its entirety, with prejudice;

(b)    Awarding all relief sought by Defendants in the Counterclaims;

(c)    Awarding Defendants their costs and disbursements associated with this action, including reasonable attorneys' fees, to the maximum extent allowed by law; and

(c)    Granting Defendants such other and further relief as this Court deems just and proper.

Dated: July 12, 2019              **SHEPPARD MULLIN RICHTER & HAMPTON LLP**

                                  By:____*/s/ Brian D. Murphy*____
                                         Brian D. Murphy
                                         Lindsay C. Stone
                                         30 Rockefeller Plaza, 39th Floor
                                         New York, NY   10112
                                         Tel.: 212.653.8700
                                         Fax: 212.653.8701
                                         bmurphy@sheppardmullin.com
                                         lstone@sheppardmullin.com

                                         *Attorneys for Shelia Haley and Bond Pharmacy, Inc. d/b/a*
                                         *AIS HealthCare*


                                  **ZARWIN BAUM DEVITO KAPLAN SCHAER & TODDY P.C.**

                                  By:____*/s/ David F. McComb*____
                                         David F. McComb
                                         1818 Market St., 13th Floor
                                         Philadelphia, PA 19103-3638
                                         dfmccomb@zarwin.com

                                         *Attorneys for Shelia Haley and Bond Pharmacy, Inc. d/b/a*
                                         *AIS HealthCare*